GEORGE H. THORNLEY AND REBECCA W. THORNLEY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 105554. Promulgated June 25, 1943.

*Frederick E. S. Morrison, Esq.*, and *Calvin H. Rankin, Esq.*, for the petitioners.

*Bernard D. Daniels, Esq.*, and *Walter D. Perry, Esq.*, for the respondent.

226

OPINION.

HARRON, *Judge: Issue 1.*—The question arises under section 22 (b) (2) of the Revenue Act of 1936.[1] See respondent's regulation construing this section.[2] Petitioner received payments from insurance companies in the taxable year under an arrangement whereby he is to receive periodical payments during a limited number of years. Respondent has determined that the payments received in the taxable

---

[1] SEC. 22. GROSS INCOME.

 * * * * * * *

(b) EXCLUSIONS FROM GROSS INCOME.—The following items shall not be included in gross income and shall be exempt from taxation under this title:

 * * * * * * *

(2) ANNUITIES, ETC.—Amounts received (other than amounts paid by reason of the death of the insured and interest payments on such amounts and other than amounts received as annuities) under a life insurance or endowment contract, but if such amounts (when added to amounts received before the taxable year under such contract) exceed the aggregate premiums or consideration paid (whether or not paid during the taxable year) then the excess shall be included in gross income. Amounts received as an annuity under an annuity or endowment contract shall be included in gross income; except that there shall be excluded from gross income the excess of the amount received in the taxable year over an amount equal to 3 per centum of the aggregate premiums or consideration paid for such annuity (whether or not paid during such year), until the aggregate amount excluded from gross income under this title or prior income tax laws in respect of such annuity equals the aggregate premiums or consideration paid for such annuity. * * *

[2] ART. 22 (b) (2)-2. [Regulations 94.] *Annuities.*— Amounts received as an annuity under an annuity or endowment contract include amounts received in periodical installments, whether annually, semiannually, quarterly, monthly, or otherwise, and whether for a fixed period, such as a term of years, or for an indefinite period, such as for life, or for life and a guaranteed fixed period, and which installments are payable or may be payable over a period longer than one year. * * *

year are annuities. The broad question under-this issue is whether the payments are annuities within the meaning which the Congress has intended that term to have in section 22 (b) (2).

The term *annuity* is variously defined. For a discussion of the various definitions given to the term see *Commonwealth* v. *Metropolitan Life Ins. Co.*, 98 Atl. 1072; *In re Thornton's Estate*, 243 N. W. 389; *Bodine* v. *Commissioner*, 103 Fed. (2d) 982. But the problem presented by the issue here is to determine the meaning which Congress intended the term *annuity* to have for the particular purpose of the statute.

Congress was concerned with the increasing tendency to purchase annuities. Under the law as it was prior to 1934, income tax upon income realized from investments in annuities was postponed indefinitely. It was believed that the tax on annuity receipts to the extent that they represent income should not be postponed.[3] The rule as adopted in section 22 (b) (2) is to be applied to amounts received on annuities under annuity contracts and also to amounts received as annuities under endowment contracts. But the terms of section 22 (b) (2) as it had appeared in the Revenue Act of 1932, and earlier acts, were not amended in their entirety. Section 22 (b) (2) in the Revenue Act of 1934, in the first sentence, still excludes from gross income "amounts received" under a life insurance or an endowment contract, other than at death and other than annuities, until the amounts received in the taxable year, when added to the amounts received in earlier years, equal the premiums or consideration paid. Thus the statute envisioned some types of periodical installment pay-

---

[3] See Report No. 704, p. 21, of the Ways and Means Committee, and Report No. 558, p. 23, of the Finance Committee, accompanying the 1934 bill to provide revenue. In Report No. 704, p. 21, the following appears:

"Section 22 (b) (2). Annuities, etc.: The present law does not tax annuities arising under contracts until the annuitant has received an aggregate amount of payments equal to the total amount paid for the annuity. Payments to annuitants are, in fact, based upon mortality tables which purport to reflect a rate of return sufficient to enable the annuitant to recover his cost and in addition thereto a low rate of return on his investment. The change continues the policy of permitting the annuitant to recoup his original cost tax-free but requires him to include in his gross income a portion of the annual payments in an amount equal to 3 percent of the cost of the annuity. While the percent used is arbitrary, it approximates the rate of return in the average annuity.

"Statistics show that an increasing amount of capital is going into the purchase of annuities, with the result that income taxes are postponed indefinitely. The change merely places the return of this form of investment on the same basis as other forms of investment by taxing that portion of each payment which in fact constitutes income."

"Prevention of Tax Avoidance," Preliminary Report of a Subcommittee of the Committee on Ways and Means (73d Cong., 2d sess.), p. 13, part II. Minor Problems, (1) Annuities:

"Section 22 (b) (2) of the Revenue Act of 1932 provides for taxing annuities, but not until the total amounts received exceed the total amount paid for the annuity.

"Your subcommittee is of the opinion that the tax on annuity receipts to the extent that they represent income should not be postponed as permitted by present law. Such receipts are, as a matter of fact, part interest and part return of capital. Therefore, it is recommended that some amount representing the portion of the annuity receipts consisting of interest be made subject to the income tax. In order to facilitate administration, it is recommended that an arbitrary rule be adopted that 3 percent of the amount paid for the annuity shall be deemed to be interest. This rule is applied only to annuity contracts."

ments under a life insurance or endowment contract upon which income tax was to be postponed until the taxpayer recovered his capital investment. The statute does not appear to contain any definitions, and yet that is not entirely true. The statute speaks of (1) *"amounts received"* which are to be excluded from gross income, and (2) *"amounts received"* which are to be included in gross income. *Amounts* in the second class are described, if not defined, as *"amounts received as an annuity."* The rule which sometimes aids in the construction of statutes, *expressio unius et exclusio alterious*, has some application here because if "amounts received" do not fall within the second class, they are not to be included in gross income, and the formula prescribed for determining how much is to be included in gross income has no application to "amounts received" which fall in the first class. Even so, we do not need to resort to a rule of implication in the construction of section 22 (b) (2). The statute refers to two classes of "amounts received," and the second class, being the only one defined, is narrower than the first class in our opinion, and that which does not fall within the second class must fall within the first class.

Congress deemed it sufficient to use the phrase "as an annuity" to define the class of receipts which is to be included in gross income in part. But the evident variety of meanings given to the term *annuity*, or the loose use of that term, leaves room for argument. It is necessary to inquire, therefore, what kind of receipts Congress had in mind when it referred to "amounts received as an annuity." The reports of the committees provide much in answer to the question. It is said that "Payments to annuitants are, in fact, based upon mortality tables which purport to reflect a rate of return sufficient to enable the annuitant to recover his cost and in addition thereto a low rate of return on his investment." (See footnote No. 3, *supra.*) This has received explanation in Taxable Income, Magill (1936), p. 375, where it is said:

It is well known that an annuity is calculated to yield a recipient who lives out his expectancy a total amount equal to the consideration paid, plus interest thereon. Hence, each annual payment, from the actuarial point of view, is made up partly of a return of capital and partly of income.

We think it is made very clear in the committee reports and in the Congressional hearings (see Seidman's Legislative History of Federal Income Tax Laws (1938), pp. 295–299), that Congress meant the phrase "amounts received as an annuity" to have the meaning which insurance companies and actuaries customarily give to the phrase; or, more particularly, to mean amounts computed with reference to the age and sex of the insured, or payee, and with reference to life or lives. In Life Contingencies by E. F. Spurgeon, published by the Institute of Actuaries, London, 1922, at p. 31, it is said that

"A *Life Annuity*, often called simply an *Annuity*, is a series of payments depending upon the continuance of a given life or combination of lives." If that is the meaning of "amounts received as annuities" in section 22 (b) (2), then the other class, the first class, of "amounts received" must mean, under the *exclusio* rule, amounts computed without reference to the life, age, or sex of the payee; amounts which are not based upon mortality tables; amounts in the determination of which there is no calculation which takes into consideration the possibility that the recipient will live out his expectancy.

Here we are dealing with endowment policies, as will be explained hereinafter. Under the terms of those policies, the insured is given several options under which he may receive the proceeds of the policies. The several options are substantially the same in both the Berkshire and the Phoenix policies, and so we refer to the options in the Berkshire policies for convenience. The payee can elect to receive the proceeds under option A, in installments for a definite number of years, under which option the periodical amounts which $1,000 will yield are computed without refeernce to age, sex, or life expectancy; under option B, in installments continuous for life; and under option D, in annuity payments for life, under both of which the amount of the payment is computed with reference to the age of the payee, and under D, in addition, with reference to the sex of the payee. Thus it is seen that in the policies involved one class of payments is called "annuity payments" and others are not; and the amounts of certain payments are computed with reference to the life expectancy of the payee based upon mortality tables, while others are not. According to our understanding, practically all insurance companies offer to the payee the same or similar classes of options under which to receive the proceeds of policies. It is a reasonable conclusion, therefore, that Congress used the phrase "amounts received as an annuity" with the knowledge that insurance companies distinguish certain kinds of payments, called annuity payments, from other kinds of payments which are computed without reference to life expectancy and mortality tables.

So much for background discussion. Against this background a discussion of the facts takes on added significance and the question may be decided with more regard for the realities of the situation involved. In discussing the facts we shall point out from time to time the conclusions to be made. Some further discussion of the nature of annuity payments will be pertinent, however.

In 1930 petitioner took out two insurance contracts with Berkshire which were 23-year payment combination life insurance and endowment contracts. At the end of 5 years petitioner decided to surrender the policies. Petitioner had paid premiums in the total amount of $33,255.33 under the two policies. At the date of surrender the cash

surrender values aggregated $22,469.25. In 1924 and 1925 petitioner took out 8 insurance contracts with Phoenix. These policies were similar to the Berkshire policies and were combined life insurance and endowment contracts. In 1936 petitioner decided to surrender these policies. He had paid premiums on all the policies in a total amount of $29,108.56. The total cash surrender values aggregated $22,940.56. It was provided in the contracts that the insured could elect to have the whole or any part of the proceeds of the policies paid under any one of the stated options instead of in one sum. It was also provided in the contracts that the companies would give an agreement to pay the proceeds of the policies in accordance with the method of settlement elected by the insured in exchange for the policies. These provisions in the contracts contemplated the settlement of a policy when it became due. But the same provisions were applicable to the settlement of cash surrender values of policies surrendered before their due dates. The companies issued the prescribed agreements to petitioner in exchange for the policies. The agreements state that the policies have been surrendered, that the respective amounts of the cash surrender values were payable to petitioner on the dates of surrender of the policies, and that said amounts shall be payable to petitioner in accordance with the provisions of option A, in the case of Berkshire, in 240 monthly installments of $123.81, each, and in accordance with the provisions of option 3, in the case of Phoenix, in 10 annual installments of $2,657.24, each. These periodical installment payments aggregate the amount of the proceeds due under each policy upon surrender, with interest. In other words, petitioner, or certain named individuals after petitioner's death, is to receive the above stated periodical installments for 20 years and 10 years, respectively, at the end of which periods the proceeds of the policies, together with interest, will be exhausted. That is, at the end of 20 years, there will'be received from Berkshire the proceeds in the amount of $22,469.25 and an increment of $7,245.15; and at the end of 10 years there will be received from Phoenix the proceeds in the amount of $22,940.56, and an increment of $3,631.84.

Respondent has treated the transactions between petitioner and the companies as if the proceeds of the policies had been paid to petitioner in full at the time he surrendered the policies, and he had thereupon paid the money back to the companies in the purchase of annuities. Respondent contends that when the companies retained the proceeds of the policies instead of paying them to petitioner, he received the money constructively, and the transaction was the same, in substance, as one involving the purchase of annuities. Thus respondent, in applying the formula prescribed in section 22 (b) (2) for taxing annuities, took the amounts of the proceeds of the policies as consideration paid for annuities. He in-

cluded in gross income 3 percent of the proceeds of the Berkshire policies, $22,469.25, or, $674.08; and 3 percent of the proceeds of the Phoenix policies, $22,940.56, or, $688.22.

In our opinion, respondent's treatment of the transactions is incorrect. The form of the transactions is of vital importance in determining the intention of the parties to the transactions. In the first place, upon the surrender of the policies, the proceeds thereof became due and payable to petitioner. He was entitled to have the proceeds paid to him then in cash in one sum. He elected to leave the principal sums due to him with the companies, and he elected to accept payment thereof in installments. In the event of his death, he designated the persons who are to receive the installments. The principal sums are due petitioner although they are payable only in the manner agreed upon, and petitioner has a property interest in the principal sums, the proceeds of the policies. The situation resembles leaving money on deposit with the companies, at interest, with an agreement to accept payment in installments. The situation is like an account receivable. If petitioner had not named beneficiaries of the settlement agreements, other than himself, in the agreements, and if he died before receiving the payments due him under option A and option 3, then, upon his death, all of the remaining unpaid installments would be commuted and paid in one sum to the executor, administrator, or assignee of petitioner. We point out, also, as an additional but not decisive factor, that in the agreement with Berkshire petitioner reserved the right to revoke his request as to the method of paying the proceeds of the policies and to receive the commuted value of any of the unpaid installments without the assent of any beneficiary named in the agreement. This further supports the conclusion that petitioner had a property interest in the proceeds of the Berkshire policies. While no similar reservation appears in the Phoenix agreements, the matter is open to the argument that petitioner can receive the commuted installments because it is provided in the Phoenix policies that the payee under option 3 may commute in one payment any unpaid installments under option 3. However, we do not rest our conclusion solely upon the existence of the right to commute the unpaid installments.

Petitioner could have, but did not, elect to receive annuity payments under option D and option 5 of the respective policies. We understand, from reading the terms of all of the settlement options, that upon electing to receive annuity payments petitioner would lose all property interests in the proceeds of the policies, as such. For example, if petitioner died within a short time after making the election to receive annuity payments, the companies would retain the unpaid balance of the original proceeds. Under an election to receive annuity payments, the only right of petitioner would have been

a right in the annuity payments themselves, and not in any principal fund or source from which the annuity payments might be derived. If petitioner had elected to receive annuity payments in settlement of the policies he would have transferred his interest in and to the proceeds of the policies as consideration for the purchase of annuity payments. In *Commonwealth* v. *Beisel*, 13 Atl. (2d) 419, a similar question was considered. The court stated the following:

"Annuity" is a term somewhat loosely used in financial and legal nomenclature and is perhaps incapable of exact definition. Generally speaking, it designates a right—bequeathed, donated or purchased—to receive fixed, periodical[2] payments, either for life or a number of years. Its determining characteristic is that the annuitant has an interest only in the payments themselves and not in any principal fund or source from which they may be derived. The purchaser of an annuity surrenders all right and title in and to the money he pays for it. On the other hand, where a debtor agrees to pay his creditor in installments at regular intervals, the debt or principal sum itself is due to the creditor although payable only in the manner agreed upon; it is an account receivable in which he has a property interest. Therefore, installment payments of a debt, or payments of interest on a debt, do not constitute an annuity. See *Barber's Estate*, 304 Pa. 235, 241, 242, 155 A. 565; *Keiper* v. *United Zion Home*, 108 Pa. Super. 28, 31, 32, 164 A. 367.

[2] To constitute an "annuity" it is not necessary that the payments be annual.

It is concluded that petitioner did not purchase annuities from Berkshire and Phoenix under the agreements executed under the option settlement under which petitioner elected to have the proceeds of the policies paid in equal installments for 20 and 10 years to himself, or to his daughter in the event of his death. Respondent erred in treating the transactions as purchases of annuities, and the installment payments as "amounts received as an annuity." We point out, also, that it is our understanding that petitioner could not have taken the proceeds of the policies and purchased any contracts under which installments would be paid for a fixed term without reference to the continuation of a life or lives. It is not the general practice of insurance companies to sell such contracts. The agreements which were executed by the companieš and the petitioner are written only upon the surrender of policies of insurance and are not to be confused with annuity contracts which some insurance companies do write. We are of the opinion, further, that the installments under the election (as to mode of payment of the proceeds of the policies) which petitioner made in the settlement of his right to receive the proceeds of the cash surrender values of the policies were not *amounts received as an annuity* within the meaning which Congress intended that clause to have in section 22 (b) (2). As distinguished from one method of settlement provided under the policies, namely, annuity payments, installment payments under options A and 3 were not computed with reference to mortality tables, the age or sex of the

payee. Such installments, therefore, are not amounts received as annuities under endowment contracts. We have previously regarded *annuities*, within the purview of section 22 (b) (2), to mean payments computed with regard for life expectancy, and we take the same view here. *F. A. Gillespie*, 38 B. T. A. 673; *Anna L. Raymond*, 40 B. T. A. 244; affd., 114 Fed. (2d) 140; certiorari denied, 311 U. S. 710; *Title Guarantee & Trust Co., Executor*, 40 B. T. A. 475. This view is supported by the committee reports, as was shown above. Labels are not determinative, but the annuity payments described in the insurance policies in question, which petitioner could have elected to receive, but did not so elect, are in fact annuity payments, and, as stated in the beginning, we believe Congress intended that the phrase, "amounts received as an annuity" under endowment contracts, should be taken to mean the same thing that the insurance companies designate as annuities in the option provisions of endowment policies.

The only resemblance we can find to annuities in the installment payments in question is that under the election petitioner made he is to receive interest on the principal sums he left with the companies. It is no doubt true that the periodical installment payments here are made up of a return of capital, in part, and interest, in part. The principal sums left with the companies will earn interest. Also, under the elected options, the installments may be increased by a share of surplus interest if such is allotted by the directors, such additions not being guaranteed.[4] We can readily envisage the adoption by the Congress of some formula like that prescribed in the second sentence of section 22 (b) (2) to treat a portion of the kind of periodical installment payment we have here, as interest, and to require such part to be included in gross income. But, we think Congress has not so legislated, reading section 22 (b) (2) in its entirety. Rather, Congress has continued and permitted, under the first sentence of section 22 (b) (2), the exclusion from gross income of all of periodical payments under endowment contracts until they equal consideration paid, other than annuity payments. We would be extending the scope of the second sentence of section 22 (b) (2) if we ignored the provisions of the first sentence of the section and treated all amounts received under endowment contracts as *annuities*, under a loose use of that term. It appears that the Commissioner's interpretation of section 22 (b) (2) in his regulation, quoted before in the margin, is not consistent with the statutory provisions *if* his regulation means that all periodical installments which are payable over a period of more than one year constitute "*annuities*" under section 22 (b) (2). We are not certain that his regulation is to be understood to go so far because, in it, he

---

[4] In the taxable year petitioner received "dividends" from Berkshire and Phœnix in the respective amounts of $104.14 and $35.27, over and above the amounts of the guaranteed installments.

refers to "amounts received in periodical installments, * * * such as for life, or for life and a guaranteed fixed period." In any event, it is a rule that, to be valid, a regulation must be consistent with the statute. *Manhattan General Equipment Co.* v. *Commissioner*, 297 U. S. 129.

We believe it is abundantly clear that it is not the intention of Congress to tax capital or property under section 22 (b) (2), and that the formula prescribed in the second sentence of section 22 (b) (2) is intended to enable as close an approximation as can be made of the part of an annuity payment which represents interest. *Title Guarantee & Trust Co., Executor, supra*, p. 481. It serves to demonstrate the inapplicability of the prescribed formula to the installment payments under the settlement agreements here, to point out that under respondent's determination a tax will be levied upon principal, taking into consideration the entire periods. Under the agreements with Berkshire the fixed installments will aggregate $29,714.40 over the 20-year period. We have shown above that this amount represents the proceeds of the policies to be repaid to petitioner, $22,469.25, plus an increment of $7,245.15. Yet under respondent's determination, over 20 years, $13,481.55 of the payments will be included in gross income and taxed. Of the amount which will be taxed, $13,481.55, the amount of $7,245.15 will constitute an increment in the form of interest and $6,236.40 will constitute a return of capital upon which tax will have been levied. We think it is conceivable that, if the principal amount of the proceeds of the Berkshire policies were left with the company for a sufficiently lengthy period of time, a very much larger portion of the principal would be taxed under the theory that respondent has followed here. For example, petitioner could have elected to have the principal amount of the proceeds of the policies paid to him in 600 monthly installments, under option A. Thus, over a period of 50 years, 3 percent of the amount of the proceeds of the policies would be included in gross income in each year and a correspondingly larger portion of the principal, or capital recovered, would be taxed under respondent's theory.

The same is true of the payments to be received from Phoenix, the increment over the amount of the proceeds being $3,631.84 and the amount to be included in gross income over 10 years under respondent's determination being $6,882.17. Also, under option 3 of the Phoenix policies, petitioner could have elected to have the proceeds paid to him over 50 years instead of 10, and the same result would follow under respondent's theory as is pointed out above.

Our conclusion is that the installment payments which petitioner received from the insurance companies were "amounts received * * * under a * * * endowment contract," and since the amounts received in the taxable year, when added to the amounts

received before the taxable year, do not exceed the total amounts of either the premiums paid or the proceeds of the respective policies, no part of the payments should be included in gross income. Further, the payments were not "amounts received as an annuity under an annuity or endowment contract" and no part of the payments should be included in gross income. It is so held, and respondent's determination is reversed.

The issue presented does not reach the question of what was the "consideration paid" for the installment payments in question for purposes of the first sentence of section 22 (b) (2). It may or it may not be the aggregate premiums paid for the original policies, in view of the fact that the policies were surrendered prior to their maturity and the settlement agreements related to the method of paying the amounts of the cash surrender values, or the proceeds, due to petitioner upon the surrender of the policies. No determination is made of such possible question.

*Issue 2.*—The question under this issue is whether the stock in N. W. Ayer & Son, Inc., which petitioner sold in 1937 was held for more than 10 years for purposes of computing the holding period which fixes the percentage of the gain to be recognized under section 117 of the Revenue Act of 1936. Petitioner received the stock in question in 1929 in an exchange, and the parties are agreed that no gain or loss was recognized upon the receipt of the stock. Each party agrees that the stock was received in exchange for property, but the parties do not agree upon what the property was. The question turns upon the conclusion to be reached on that point, for it is provided in section 117 (c) (1)[5] that "In determining the period for which the taxpayer has held property received on an exchange there shall be included the period for which he held the property exchanged."

Petitioner contends that he received the stock in exchange for his 10 percent "interest in the partnership," that such partnership interest was acquired on or before January 1, 1927, and that, since the stock was sold on January 4, 1937, the period he held the stock was more than 10 years. If petitioner's contention is correct, it follows that only 30 percent of the gain is taxable.

In the agreement of April 23, 1929, between the partners of N. W. Ayer & Son it was provided that the entire assets of the partnership should be conveyed to the new corporation, subject to the partnership liabilities assumed, and that stock in the new corporation should be

---

[5] SEC. 117. CAPITAL GAINS AND LOSSES.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;

(c) DETERMINATION OF PERIOD FOR WHICH HELD.—For the purpose of subsection (a)—

(1) In determining the period for which the taxpayer has held property received on an exchange there shall be included the period for which he held the property exchanged, if under the provisions of section 113, the property received has, for the purpose of determining gain or loss from a sale or exchange, the same basis in whole or in part in his hands as the property exchanged.

issued "In exchange for the assets so to be transferred." The stock was to be issued to the respective partners, "in full payment for their respective interests in said assets." The total number of shares issued was 761,061 shares, and the number of shares received by each partner was in the same proportion as each partner's interest in the partnership. Petitioner's interest in the partnership was 10 percent, and he received 10 percent of the total shares distributed, or 76,106 shares.

Respondent determined the percentage of capital assets and noncapital assets which were exchanged for the stock, and found that, roughly, 8.05 percent of the assets received by the corporation were capital assets and 91.95 percent were noncapital assets. The stock which petitioner sold on January 4, 1937, was acquired on May 1, 1929, so that it was held for more than 5 years but less than 10 years. Respondent determined that no "tacking" should be permitted with respect to the part of the stock which was received in exchange for the noncapital assets, i. e., no period should be added to the 6½ years petitioner had held some of the stock. He recognized that "tacking" should be allowed for the period during which the capital assets involved in the exchange had been held. He determined that the capital assets had been held for a period back to January 1, 1927, or before, so that something over 3½ years should be added to the period that some of the stock was held. The net effect of respondent's determination was to hold that 8.05 percent of the stock sold in the taxable year had been held for more than 10 years, and that 91.95 percent of the stock had been held for more than 5 years but less than 10 years. The total amount of the gain realized from the sale of the stock in the taxable year was $261,659.60. Respondent determined that 30 percent of $21,052.01 of the gain was taxable, or, $6,315.60; and that 40 percent of $240,607.59 of the gain was taxable, or $96,243.04, total, $102,558.64. The amount of the taxable gain which petitioner included in gross income was $78,497.88. Respondent added to income $24,060.76 as additional taxable gain. (The total gain was broken down as follows: 8.05 percent of the total gain equals $21,052.01; and 91.95 percent of the total gain equals $240,607.59.) Respondent followed G. C. M. 20251, C. B. 1938-2, p. 169, and G. C. M. 11557, C. B. XII-1, p. 128, in making his determination.

Respondent argues that all that petitioner exchanged for the stock he received was his *interest in the assets* of the partnership. In support of this contention respondent points out that under the April 23, 1929, agreement the undistributed profits of the partnership credited on the partnership books to the respective partners were to be loaned to the corporation at 6 percent. On April 30, 1929, there was a net credit of undistributed profits of the partnership in the personal account of petitioner in the amount of $139,683.09, and that amount was transferred to the corporation. Respondent argues that

petitioner's capital account in the partnership was not exchanged for the stock which he received, and, therefore, all that petitioner exchanged for the stock was his *interest in the assets* of the partnership which remained after his interest in the undistributed profits was loaned to the corporation.

We think the question is controlled by the terms of the agreement of April 23, 1929, hereinafter called the 1929 agreement. We believe, also, that it is extremely important in the determination of the question that the partnership went out of existence, in fact. The latter point is considered first.

It was provided in the 1929 agreement that the partnership should be dissolved and the articles of partnership terminated as of April 30, 1929. For all practical purposes the partnership was dissolved, although the attorney who carried out all of the steps neglected to cancel the registration of the partnership under the Fictitious Names Act, a Pennsylvania statute, at the time the corporation took over. Clearly, the intent and the fact is that the corporation succeeded the partnership and the partnership ended. It was intended, also, that there should not be any interval between the business activities of the partnership and the business activities of the corporation. The corporation was to "take over" the business on May 1, 1929. That was done. However, the details of this close transition in the ending of formal business activities by one entity and the beginning of formal business activities by a new entity are not material and petitioner errs in laying so much emphasis on that fact. Also, it is unnecessary to construe the transition as a constructive dissolution of the partnership with a constructive distribution of assets to the individual partners, first, and an immediate transfer by them to the corporation, as respondent argues should be done. The 1929 agreement is clear on the point that certain properties owned by the partnership were to be conveyed to the corporation and other properties were not. There was an employees' trust known as the F. Wayland Ayer Employees' Trust. It was entitled to a share in the net earnings of the partnership and, as collateral for that interest, 10 percent of the capital interest of Wilfred W. Fry in the partnership was pledged. Adjustments had to be made so that part of the partnership earnings for the first four months of 1929, up to April 30, 1929, would be paid to the employees' trust, Wilfred Fry's capital interest would be released from pledge and the trust agreement would be terminated as of April 30, 1929. The books of the partnership were to be closed on April 30, 1929, to enable the making of the above adjustments, and others. Briefly, out of the gross earnings of the first four months of 1929, distributions were to be made to branch partnerships in New York and Chicago and, after the above, the partners were to be paid some of the net earnings for the first four months in proportion to

their respective capital interests, and certain benefit funds were to be paid part of said net earnings. When all of this was done, whatever undistributed profits and earnings stood to the respective credits of the individual partners at the close of business on April 30, 1929, were to be *loaned* to the new corporation at 6 percent. It can not be concluded that the corporation took over the capital accounts of the partners in exchange for stock. There is no evidence to show any modification of the terms of the agreement relating to the lending to the corporation of the accumulated profits to which each partner was entitled. In every real sense the new corporation received only the assets remaining after the above adjustments and it, then, proceeded to carry on the business which had been conducted formerly by the copartnership. We believe it clear, therefore, that the partnership ended on April 30, 1929, and the new corporation did not acquire any *interests in the partnership* from anyone. It was impossible for the corporation so to do.

The property rights of a partner, under Pennsylvania statute, consists of (1) his rights in specific partnership property, (2) his interest in the partnership, and (3) his right to participate in management. A partner is a co-owner with his partners of specific partnership property. A partner's interest in the partnership is his share of the profits and surplus, and that is personal property. A partner can convey his interest in the partnership, but such conveyance merely entitles the assignee to receive the profits to which the assigning partner would be entitled. See Purdon's Pennsylvania Statutes, Ann. Title 59—Partnerships, pars. 71, 72, 73, 74, 91. It needs no argument to show that on April 30, 1929, the partnership was dissolved by agreement of the partners to cease the conduct of the business themselves. On and after May 1, 1929, the business which they had conducted, formerly, themselves was carried on by a corporation and all profits were the profits of the corporation. It is a logical absurdity for petitioner to contend that he conveyed to the new corporation his "interest in the partnership."

The whole effect of the 1929 agreement was to work out a dissolution of the partnership under which each partner received, constructively, his share in the accumulated and undivided profits of the partnership, and all of the partners, as tenants in partnership, conveyed the remaining specific partnership property to the corporation under a bill of sale. There is no evidence that the 1929 agreement was not carried out with faithful adherence to its terms. The agreement provided that the stock of the corporation should be given to the partners in exchange for the assets to be transferred, and "in full payment for their respective interests in said assets." It is held that petitioner received the stock in exchange for his interest in the assets conveyed to the corporation.

Under this holding, the period during which petitioner held the stock which he sold in the taxable year must include the period during which he had an interest in the specific property of the partnership. Sec. 117 (c). See also, *City Bank Farmers Trust Co.* v. *United States* (Ct. Cls.), 47 Fed. Supp. 105. Petitioner has not introduced evidence on the matter. The period during which he held an interest in the partnership may not be presumed to have been coterminous with the period during which the partnership held specific property. Obviously, the partnership must have acquired various specific properties at different dates. It held real estate and securities. There is no evidence about the date when the partnership acquired specific properties. Under such circumstance, respondent's determination that some of the properties which were conveyed to the new corporation were noncapital assets can not be set aside.

Under this issue respondent is sustained.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

DISNEY, *J.*, concurs only in the result.

---

HILL, *J.*, dissenting: I agree with the majority that the contracts under which the payments here involved were received by petitioner are not annuity contracts and that the provisions of section 22 (b) (2) for the taxing of annuities do not apply. It is my opinion, however, that such contracts are not insurance or endowment contracts within the meaning of section 22 (b) (2) and that that part of such payments which represents increment to the cash surrender values of the insurance policies is taxable income in the year received under section 22 (a). Both the insurance and endowment contracts represented by the insurance policies ceased to exist when the insured stopped performance thereof and surrendered them before maturity.

The amounts of the surrender values were immediately payable in cash to petitioner. The total of such surrender values measured the money obligation of the insurance companies to petitioner. The total of the amounts of such surrender values represented that part of the premiums paid on the insurance policies in excess of that earned for life insurance. Had the cash values of the policies been paid to petitioner at the time of the surrender of the policies there would have been returned to him in full that part of such premiums. Instead of an immediate cash payment of the surrender values at the time of the surrender of the policies, petitioner elected to accept a contract for the payment of such surrender values with an increment thereto tantamount to interest payable in amortized installments over a specified period of years. That was not an insurance or endowment contract. Hence, the provisions of section 22 (b) (2) do not apply.

The endowment contracts ended upon the surrender and cancellation of the policies before their terms had been performed. The contract for payment of the surrender values of the policies was one merely for the discharge by deferred installment payments of a fixed money obligation together with a stipulated added compensation for use of the money pending such deferments in payment. Each installment payment represented a proportionate part of the total amortization of the principal and the increment thereto. Hence, with each installment payment petitioner received an aliquot part of the total increment provided by the deferred payment contract. It is my view that such increment is taxable under section 22 (a) as and when received. The total of the increment amortized and the total amounts of the installment payments received by petitioner in the taxable year are ascertainable from the facts of record. Therefore, the part of the increment which is taxable income to petitioner in the year involved is readily calculable.

It is suggested that the views I have here expressed are outside the issue herein presented, namely, whether the installment payments are taxable as annuities, and hence have no place in the consideration of this proceeding. It is my opinion that the question we have to decide is whether on the facts presented the deficiency in tax determined by the respondent should be sustained in whole or in part under any provision of the revenue acts.