ESTATE OF HARRY SNIDER, LENA SNIDER, EXECUTRIX, AND LENA SNIDER, INDIVIDUALLY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 58199.    Filed February 27, 1959.

*Joseph J. Krohn, Esq.,* and *Samuel Freedman, C.P.A.,* for the petitioners.

*Frank V. Moran, Jr., Esq.,* for the respondent.

OPINION.

OPPER, *Judge:* In 1932 decedent secured a life annuity contract under the terms of which he could, upon the maturity of the contract in 1953, receive monthly specified payments for the remainder of his life. The contract entitled him prior to maturity to make certain life or refund annuities' elections, and in 1950, the instant tax year, and prior to maturity an alternative election was agreed upon between decedent and the insurance company pursuant to which he received the company's agreement to pay the principal sum, plus interest and dividends, in specified monthly installments until the principal should be exhausted. The principal could be withdrawn upon decedent's request "subject to the * * * [company's] right to defer payment of any amount withdrawable for a period not to exceed six months."

The conclusion urged by respondent, that because of this obligation to pay the principal, decedent was in constructive receipt in the instant tax year of the entire principal accumulated for his annuity, can be reached only if there was no substantial impediment to his acquisition of the funds at any time he chose. *George W. Johnson*, 25 T.C. 499.

To constitute [constructive] receipt in such a case the income must be credited or set apart to the taxpayer *without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is to be made* * * *. [Regs. 111, sec. 29.42–2. Emphasis added.]

This seems to us to require that there could be no legal provision of real consequence upon which the debtor could rely in refusing immediate payment.

We think that cannot be said here. Even if decedent had made immediate demand for the entire sum, and even if it could be said that he would thereby suffer no serious detriment in his collateral rights, see, e.g., *Estate of W. T. Hales*, 40 B.T.A. 1245; cf. *Blum* v. *Higgins*,

(C.A. 2) 150 F. 2d 471—a question we do not reach—nevertheless, the insurance company could technically and legally delay payment for up to 6 months under the express terms of the agreement. We think this an impediment to his actual immediate and legal right to the payment which prevents the constructive receipt doctrine from applying.

That the insurance company would not in reality have insisted upon this postponement, a fact of which decedent was apparently unaware, seems to us to make no·difference. There was no doubt of the insurance company's complete legal control of the situation, which is inconsistent with the existence of control in petitioner. Any provision for the protection of one party may be waived by it. But we cannot say for that reason that it does not exist. See *White* v. *Poor*, 296 U.S. 98; *Helvering* v. *Helmholz*, 296 U.S. 93. And the provision is not of a merely formal nature like those sometimes to be found where periodic payments, such as interest [1] or dividends, are due on certain dates. Cf. *Maurice Fox*, 20 T.C. 1094, affd. (C.A. 3) 218 F. 2d 347. There, a long continued practice known to the taxpayer may well have the effect of converting the provision into a practical nullity. But we cannot similarly regard a condition relating to the due date of the payment of an entire principal sum which, if not paid in installments as primarily provided, will be paid only once.

The foregoing applies to respondent's theory that decedent constructively received the entire capital investment because he could demand the principal at any time. If respondent is seriously advancing an alternative argument that the income was received in the instant year because it is as though the annuity proceeds were paid to him in cash and he then reinvested them in the periodic payment contract, we are met with a flat rejection of that concept in respondent's own rulings.

A holder of an endowment policy who, prior to the maturity date, notifies the insurer of his election to receive the proceeds under an option which provides for the payment of the proceeds in installments does not constructively receive the total amount of the proceeds on the date of maturity. * * * [I.T. 3963, 1949–2 C.B. 36.]

This theory was also repudiated in *George H. Thornley*, 2 T.C. 220, 231, 232,[2] reversed on other grounds (C.A. 3) 147 F. 2d 416, where the

---

[1] *"Interest* credited on savings bank deposits, even though the bank nominally has a rule, seldom or never enforced, that it may require so many days' notice before withdrawals are permitted, is income to the depositor when credited. * * *" (Regs. 111, sec. 29.42–3. Emphasis added.)

[2] "Respondent has treated the transactions * * * as if the proceeds of the policies had been paid to petitioner in full at the time he surrendered the policies, and he had thereupon paid the money back to the companies in the purchase of annuities. Respondent contends that when the companies retained the proceeds of the policies instead of paying them to petitioner, he received the money constructively, and the transaction was the same, in substance, as one involving the purchase of annuities. * * *

"In our opinion, respondent's treatment of the transactions is incorrect. * * *"

election was to take effect before maturity of the policy, a situation which is, of course, to be distinguished from one where the policy is permitted to mature and the proceeds are then reinvested in a new contract. *Constance C. Frackelton*, 46 B.T.A. 883; *Blum* v. *Higgins*, *supra*.

Petitioner was, to be sure, in the position where from the very inception of the policy he could demand its cash surrender value. Since this was an annuity agreement, this cash payment almost from the beginning would have been greater than the amount deposited by decedent. On that theory, which is not supported by any case, regulation or ruling, decedent would have constructively received each year the increase in the cash value of the policy. But even on that untenable hypothesis, in the year before us the only amount with the constructive receipt of which he could be charged would be the increment in that year.

And if it were to be argued, which it is not, that the form of words "I hereby surrender the said policy * * * for its cash surrender value" demonstrates that decedent did in fact receive the cash surrender value at that time, a reading of the entire paragraph in which that language appears prohibits any such construction. Immediately following those words decedent expressly reserves the right to the "privileges and benefits under the said policy" that the amount specified shall be applied "under the option elected." This would have been impossible had decedent in fact surrendered the policy, and for that reason it is equally impossible to say that he elected to receive the cash surrender value of the policy or that he could "hereby surrender" the policy.

We conclude that decedent at no time elected to take the cash surrender value of the policy. Had he done so, he would have been required to surrender the policy completely. Instead he elected an option which under the policy, as amended, he was permitted to do, provided he did not surrender the policy. In some respects this is similar, though a stronger case, to the one dealt with in S.M. 5680, V–1 C.B. 32 (1926). There, at *maturity*, the owner of a policy had several options, one of which was to leave the face value (which he could have obtained) on deposit with the company without withdrawing it. The ruling states:

The taxpayer, having exercised the first option, actually received the sum of 11x dollars [a cash dividend], and the question is, Did he constructively receive the further sum of 21x dollars which he would have received if he had exercised the third option [to take the paid-up value]? It is apparent that the taxpayer could not at the same time possess both his insurance and the 32x dollars, which was payable only upon the cancellation of the policy. The only theory upon which it can be held that he constructively received the latter amount is that he, for the momentary period he is supposed to have been in

constructive possession of this sum, had constructively surrendered his policy, a theory unknown to the law of insurance. \* \* \* The only way by which the taxpayer could have acquired the guaranteed reserve was by the surrender of his policy and the loss of that which for 20 years he had paid to acquire. There can be no constructive receipt of that which can be acquired only by the surrender of valuable rights. \* \* \*

This disposition of the case does not, to be sure, resolve the total problem. The 6 months in question expired in the following year and it may be, of course, that decedent can be charged with this income in that year. See sec. 1311, I.R.C. 1954; cf. sec. 3801, I.R.C. 1939.

We do not suggest that respondent was to any extent unreasonable in seeking to place the receipt of the income in the instant year. Ever since the decision in *Ross* v. *Commissioner*, (C.A. 1) 169 F. 2d 483, there has been the likelihood that he must take action under the constructive receipt doctrine in the earliest year of the remotest possibility, or risk imperiling the revenue. That does not, however, mean that in every such case the doctrine must be held to apply, and we think it does not apply to the year now before us. Because of the claimed overpayments,

*Decision will be entered under Rule 50.*

Reviewed by the Court.

FISHER and DRENNEN, *JJ.*, concur in the result.

---

MURDOCK, *J.*, dissenting: The Commissioner's first argument that the decedent constructively received the $110,950 could be that the decedent had a right to call for and receive the cash surrender value of the September 29, 1932, contract in a lump sum. He made such a call and surrendered (terminated) that contract. He was then free apparently to do whatever he chose with the money. That would be a completed transaction for tax purposes and would result in the profit determined.

It is immaterial that he chose to go into another transaction with Equitable since that appears to have been a new arrangement made at arms length.

If the fact is that his words ("I hereby surrender the said policy to the Society for its cash surrender value") do not reflect what he did and he merely called for further procedure under a valuable option given in that contract, so that there was no closed transaction for income tax purposes, that should be clearly shown by the facts. This route is complicated by the fact that the ultimate arrangement for payment was not an option under the contract at the time of the surrender on September 14, 1950.

I disagree with the discussion on constructive receipt, if that must be considered.

FORRESTER, *J.*, agrees with this dissent.