ESTATE OF HARRY SNIDER, DECEASED, LENA SNIDER, EXECUTRIX, AND LENA SNIDER, SURVIVING WIFE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 88472. Filed November 5, 1962.

*Burton L. Williams, Esq.,* for the petitioners.
*Albert R. Doyle, Esq.,* for the respondent.

### OPINION.

ARUNDELL, *Judge:* Respondent determined a deficiency in income tax for the calendar year 1951 in the amount of $12,517.26.

Three errors were assigned by petitioners as follows:

(a) The Commissioner erred in determining that the Decision of the Tax Court of the United States in Estate of Harry Snider, 31 TC 1064, constituted a determination within the meaning of Section 1313 of the Internal Revenue Code of 1954.

(b) The Commissioner erred in determining that the amount of $21,384.63 represents taxable income constructively received in the calendar year 1951.

(c) The Commissioner erred in determining that Section 1311 of the 1954 Internal Revenue Code is applicable.

The facts were stipulated and are so found.

Petitioners' decedent, Harry Snider, and petitioner Lena Snider were husband and wife during 1951 and resided in Newton, Massachusetts. Harry Snider and Lena Snider filed their income tax return

for 1951 with the then collector of internal revenue for the district of Massachusetts.

On September 29, 1932, The Equitable Life Assurance Society of the United States (hereinafter sometimes referred to as Equitable) issued to Harry Snider a life annuity contract No. X8932022.

At the time of the issuance of the annuity contract, Harry Snider, on his nearest birthday, would be 44 years of age. He was born March 15, 1889, and died April 11, 1957, at the age of 68.

Under the terms of the annuity contract, Equitable agreed to pay to Harry Snider a life annuity of $13,896 per year, payable during his life in monthly installments of $1,158, beginning on the anniversary of the register date of the contract upon which Harry Snider's age at nearest birthday is 65 years.

The annual premium due under the terms of the annuity contract was $5,000, payable each year on September 29, until September 29, 1953, the date on which the contract would mature.

Among other things, the annuity contract dated September 29, 1932, provided the annuitant (Harry Snider) with certain options as follows:

OPTIONS ON SURRENDER OR LAPSE.

Within three months after default in the payment of any premium after one full year's premium has been paid, the Annuitant may surrender this contract and elect one of the following Options:

(a) CASH VALUE. To receive the Cash Surrender Value as provided in Schedule "C."

*　　　*　　　*　　　*　　　*　　　*　　　*

The payment of any Cash Surrender Value may be deferred by the Society [Equitable] for a period not exceeding ninety days after receipt of application therefor.

On September 10, 1950, the life annuity contract was amended at the request of Harry Snider. The amendment thereof provided in part that:

If this contract be surrendered by the Annuitant for its Cash Surrender Value, the Annuitant, by written notice filed with the Society at its Home Office at the time of such surrender, may elect to have the Cash Surrender Value, together with any unpaid dividends or dividend accumulations hereunder, applied under Options 1, 2 or 4 of the "Modes of Settlement at Death of Annuitant" herein set forth, but for the benefit of the Annuitant in lieu of the beneficiary under this contract. A supplementary contract evidencing such election will then be issued by the Society.

The annuity contract as amended by the attachment dated September 10, 1950, provided Harry Snider with certain settlement options, Option 4 thereof being as follows:

Paid in equal annual, semi-annual, quarterly or monthly instalments of such amount as may be agreed upon until the net sum due under this contract *together with interest on the unpaid balances at the rate of 3% per annum, and such Excess Interest Dividends as may be apportioned*, shall be exhausted, the final

payment to be the balance then remaining with the Society. If the interest and Excess Interest Dividend for any year shall be in excess of the instalments payable in such year, then the total amount of the instalments for the subsequent year shall be increased by the amount of such excess. [Emphasis supplied.]

On September 14, 1950, Harry Snider elected to exercise Option 4 and filed with Equitable an election of mode of settlement relative to the annuity contract. This election provided in part as follows:

*I hereby surrender the said policy to the Society for its cash surrender value.* In surrendering the said policy to the Society, I understand that all rights, privileges and benefits under the said policy, except the right to apply the cash value proceeds under the option elected are hereby cancelled.

I hereby elect to have the net sum due including dividends under the above numbered policy settled as I have indicated below: (Minimum $1000. each option)

    \*      \*      \*      \*      \*      \*      \*

X INSTALMENT OPTION—FIXED AMOUNT:

Proceeds to be paid in _____monthly_____

(Annual, semi-annual, quarterly or monthly)

instalments of $1000.00 each until the amount so applied credited annually *with interest on the unpaid balance at the rate of 3% per annum and any excess interest dividends which may be apportioned* is exhausted, the final instalment to be the balance then remaining with the Society. *Withdrawals of not less than $100. may be made upon request at any time, subject to the Society's right to defer payment of any amount withdrawable for a period not to exceed six months.* [Emphasis supplied.]

On September 28, 1950, Equitable, pursuant to Harry Snider's election of the mode of settlement, canceled Annuity Contract No. X8932022, and thereafter, on September 29, 1950, issued to Harry Snider a supplementary Contract No. 161,332 which provided, in part, as follows:

THE EQUITABLE LIFE ASSURANCE SOCIETY
of
The United States

No. 161,332_____ $110,950.00

hereby certifies that the sum of

_____ ONE HUNDRED TEN THOUSAND NINE HUNDRED FIFTY DOL-LARS is held, subject to the provisions hereinafter stated, as a fund to be credited annually *with interest at the rate of 3% per annum on the unpaid balance*, and from such fund the Society will pay, until the fund is exhausted, monthly instalments of ONE THOUSAND DOLLARS, the first instalment payable on September 29, 1950 and subsequent instalments monthly thereafter \* \* \*

    \*      \*      \*      \*      \*      \*      \*

At any time said HARRY SNIDER may withdraw the balance remaining under this bond or may make partial withdrawals therefrom of not less than ONE HUNDRED DOLLARS.

PARTIAL WITHDRAWALS PROVIDED FOR HEREIN MAY BE MADE WITHOUT EITHER THE SURRENDER OF THIS BOND OR ENDORSE-MENT THEREON TO SHOW THE SAME.

Upon the death of said HARRY SNIDER, provided this bond is then in force, any instalments remaining unpaid shall be paid when due to said HARRY SNIDER'S wife, LENA SNIDER. At the death of the survivor of said HARRY SNIDER and said wife, any balance remaining with the Society shall be paid to the executors or administrators of such survivor_____ Nominee

\*  \*  \*  \*  \*  \*  \*

The nominee, after the death of said HARRY SNIDER, may designate (with the right to change such designation) the person to receive any instalments remaining unpaid at the death of the nominee, if there be no such person designated by said HARRY SNIDER and surviving.

\*  \*  \*  \*  \*  \*  \*

*Payment of any sum withdrawable hereunder may be deferred by the Society for a period not exceeding six months after receipt of application therefor.*

\*  \*  \*  \*  \*  \*  \*

This bond is issued in full settlement of Contract No. 8,932,022 and is effective provided said HARRY SNIDER is living on the Register date hereof. [Emphasis supplied.]

As of September 28, 1950, Harry Snider had paid to Equitable net premiums on the annuity contract in the amount of $89,565.37. The cash surrender value of the annuity contract as of September 28, 1950, was $110,950, or $21,384.63 in excess of the premiums paid.

On January 12, 1955, Harry Snider requested that Equitable rewrite the contract eliminating all withdrawal rights. The body of his request is as follows:

When, on September 14, 1950, I made the election to take the cash value of the above policy to be paid in installments it was not my intention to retain any right to make withdrawals from principal, and the fact that such withdrawl rights were included in the Supplementary Contract was not discovered by me until recently.

Therefore will you please rewrite the above contract so as to eliminate all withdrawal rights.

Subsequently, Equitable reissued the supplementary contract on a form which made no provision for any principal withdrawals.

On March 14, 1955, respondent sent to Harry Snider and Lena Snider a statutory notice of determination of a deficiency in income tax for the taxable year *1950* in the amount of $10,445.32.

In the statutory notice for the year 1950 the respondent increased the net income as disclosed by the return by "(a) Insurance proceeds $21,384.63." In the statement attached to the notice, he explained item (a) as follows:

(a) Insurance proceeds_____ $21,384.63

Excess of insurance proceeds constructively received (Sec. 42(a) I.R.C.) over net premiums paid is reportable in the above amount.

| | |
|---|---:|
| Proceeds | $110,950.00 |
| Net premiums paid | 89,565.37 |
| Excess as above | 21,384.63 |

Retirement annuity policy No. X8,932,022 taken out with Equitable Life Assurance Society on Sept. 29th, 1932 was surrendered on Sept. 9, 1950 [*sic*] for certificate stating that $110,950.00 was being held by insurer payable to you in amounts of not less than $100.00 on demand. Certificate contains other provisions relative to installment payments, interest, etc., however, it is considered that you can claim the amount on deposit with insurer without surrendering any valuable rights and therefore have constructively received the proceeds. (See Sec. 29.42 (2) & (3) of Reg. 111)

In *Estate of Harry Snider*, 31 T.C. 1064, we held that the abovementioned amount of $21,384.63 was not constructively received by the petitioners in the year 1950.

In adjusting the taxable income reported for the year *1951*, the respondent increased the income by insurance proceeds in the amount of $21,384.63. In the statement attached to the deficiency notice for the year 1951, respondent states:

It has been determined that the Decision of the Tax Court of the United States in Estate of Harry Snider, 31 TC 1064, which held that the amount of $21,384.63 did not represent taxable income constructively received in the calendar year 1950, constituted a determination within the meaning of section 1313 of the Internal Revenue Code of 1954. Accordingly, therefore, it is now determined that the amount of $21,384.63 represents taxable income constructively received in the year ended December 31, 1951 and which should be added to gross income for said year pursuant to section 1311 of the 1954 Internal Revenue Code.

Although petitioners have assigned three errors, they have only argued assignment (b) in their briefs. Assignments (a) and (c) deal with whether the statutory notice of deficiency for the calendar year 1951 was timely under sections 1311 through 1315 of the Internal Revenue Code of 1954 and petitioners apparently concede that it was. We will so assume. Cf. *Elaine Yagoda*, 39 T.C. 170 (1962).

We do not think the respondent, in contending that the amount of $21,384.63 was constructively received in 1951, is in any better position than when he contended that the same amount was constructively received in 1950. The agreements all remained the same in 1951 as they were in 1950. There were no changes. The only incident that might give some possible basis for respondent's present contention is that if in 1950 under the supplementary contract Harry Snider had made application to "withdraw the balance remaining under this bond," Equitable's right to defer payment for a period not to exceed 6 months would have expired in 1951.[1] But Snider made no such application in 1950 or at any other time, and under the supplementary contract "Payment of any sum withdrawable

---

[1] In our opinion in *Estate of Harry Snider,* 31 T.C. 1064, we made this statement:
"This disposition of the case does not, to be sure, resolve the total problem. The 6 months in question expired in the following year and it may be, of course, that decedent can be charged with this income in that year. See sec. 1311, I.R.C. 1254, cf. sec. 3801, I.R.C. 1939."

hereunder may be deferred by the Society [Equitable] for a period not exceeding six months *after receipt of application therefor."* (Emphasis supplied.) The right to defer payment for 6 months was always a possibility after an application for any withdrawal had first been made.

At this point it may be noted that a new fact was stipulated in the present record that was not before the Court in the record made for the year 1950. That fact concerns the complete elimination of all withdrawal rights requested on January 12, 1955. Not only did Harry Snider never make any application to "withdraw the balance remaining under this bond" but he notified Equitable that when he made the election on September 14, 1950, to take the cash value of Policy No. X8932022 to be paid in installments "it was not my intention to retain any right to make withdrawals from principal, and the fact that such withdrawal rights were included in the Supplementary Contract was not discovered by me until recently." Upon his request Equitable "reissued the Supplementary Contract on a form which made no provision for any principal withdrawals."

In *National Metropolitan Bank* v. *United States*, 87 F. Supp. 773, the Court of Claims, in holding that the unintended insertion of the word "insured" in an insurance contract would not be controlling, quoted from 29 American Jurisprudence, section 242, Insurance, as follows:

If an insurance policy is not that intended or does not express the actual contract intended by the parties because of the * * * mutual mistake of the insured and such agent, a court of equity has the power to grant a reformation of the policy so as to have therein expressed the true agreement of the parties. While there is some authority to the contrary, most courts hold that a policy may be reformed where it does not conform to the agreement of the parties although the mistake, insofar as the company is concerned, was that of a mere soliciting agent with no power to write or to issue a policy.

Aside from this new fact, we pointed out in *Estate of Harry Snider*, *supra*, that where, prior to the maturity date of a policy, the holder notifies the insurer of his election to receive the proceeds under an option providing for the payment of the proceeds in installments, the holder does not, under the respondent's own rulings[2] and our decision in *George H. Thornley*, 2 T.C. 220 (Issue 1), reversed on other grounds 147 F. 2d 416 (C.A. 3), constructively receive the total amount of the proceeds, as distinguished from one where the policy is permitted to mature and the proceeds are then reinvested in a new contract. Among other things, we said:

---

[2] I.T. 3963, 1949-2 C.B. 36; S.M. 5680, V-1 C.B. 32; G.C.M. 26595, 1950-2 C.B. 16.

Petitioner was, to be sure, in the position where from the very inception of the policy he could demand its cash surrender value. Since this was an annuity agreement, this cash payment almost from the beginning would have been greater than the amount deposited by decedent. On that theory, which is not supported by any case, regulation or ruling, decedent would have constructively received each year the increase in the cash value of the policy. But even on that untenable hypothesis, in the year before us the only amount with the constructive receipt of which he could be charged would be the increment in that year.

And if it were to be argued, which it is not, that the form of words "I hereby surrender the said policy * * * for its cash surrender value" demonstrates that decedent did in fact receive the cash surrender value at that time, a reading of the entire paragraph in which that language appears prohibits any such construction. Immediately following those words decedent expressly reserves the right to the "privileges and benefits under the said policy" that the amount specified shall be applied "under the option elected." This would have been impossible had decedent in fact surrendered the policy, and for that reason it is equally impossible to say that he elected to receive the cash surrender value of the policy or that he could "hereby surrender" the policy.

We conclude that decedent at no time elected to take the cash surrender value of the policy. Had he done so, he would have been required to surrender the policy completely. Instead he elected an option which under the policy, as amended, he was permitted to do, provided he did not surrender the policy. In some respects this is similar, though a stronger case, to the one dealt with in S.M. 5680, V–1 C.B. 32 (1926). There, at *maturity*, the owner of a policy had several options, one of which was to leave the face value (which he could have obtained) on deposit with the company without withdrawing it. The ruling states:

The taxpayer, having exercised the first option, actually received the sum of 11x dollars [a cash dividend], and the question is, Did he constructively receive the further sum of 21x dollars which he would have received if he had exercised the third option [to take the paid-up value]? It is apparent that the taxpayer could not at the same time possess both his insurance and the 32x dollars, which was payable only upon the cancellation of the policy. The only theory upon which it can be held that he constructively received the latter amount is that he, for the momentary period he is supposed to have been in constructive possession of this sum, had constructively surrendered his policy, a theory unknown to the law of insurance. * * * The only way by which the taxpayer could have acquired the guaranteed reserve was by the surrender of his policy and the loss of that which for 20 years he had paid to acquire. There can be no constructive receipt of that which can be acquired only by the surrender of valuable rights. * * *

When Harry Snider made his election in 1950 supplementary contract No. 161,332 provided that the fund from which the monthly payments of $1,000 were to be made was to be credited annually with interest at the rate of 3 percent per annum on the unpaid balance and that "If in any year the Society declares that funds held under this bond shall receive interest in excess of 3% per annum, the interest under this bond shall be increased for that year by an Excess Interest

Dividend as determined and apportioned by the Society." Harry Snider would have had to surrender these valuable rights if at any time he had made application to "withdraw the balance remaining under this bond." The doctrine of constructive receipt is to be sparingly applied and is to be invoked only in unique circumstances and in a clear case. *Hal E. Roach*, 20 B.T.A. 919, 924–925; *Samuel Keller Jacobs*, 22 B.T.A. 1166, 1170; *William A. Hines*, 38 B.T.A. 1061, 1067; *William H. C. Pletz*, 43 B.T.A. 140, 144; *Pedro Sanchez*, 6 T.C. 1141, 1148, affd. 162 F. 2d 58 (C.A. 2, 1947), certiorari denied 332 U.S. 815.

We hold that the amount of $21,384.63 was not constructively received by Harry Snider in the calendar year 1951 and that petitioners realized no income until the total amounts received by Harry Snider or his nominee or nominees under contract No. 161,332 exceeded the aggregate premiums of $89,565.37 paid for Policy No. X8932022. All of that will take place at a later date and the Government will not lose its tax on the income.

It thus becomes unnecessary to consider assignments of error (a) and (c).

*Decision will be entered under Rule 50.*