ESTATE OF HAROLD S. BROOKS, DECEASED, HARRIS TRUST AND SAVINGS BANK, EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2624–66. Filed July 22, 1968.

---

[2] See sec. 225(1)(1), Revenue Act of 1964, 78 Stat. 94.

*K. Raymond Clark*, for the petitioner.
*William J. Gerard*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency in the Federal estate tax of petitioner, the Estate of Harold S. Brooks, in the amount of $81,792.41. One of the adjustments contained in the statutory notice of deficiency has been conceded by petitioner. The issue remaining for decision is whether any part of decedent's interest in the W. H. Miner Profit Sharing Trust is includable in his gross estate under section 2033 or section 2039 (a) and (b), I.R.C. of 1954,[1] or excludable under section 2039 (c).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations and exhibits thereto are incorporated herein by this reference.

Harris Trust & Savings Bank is an Illinois corporation with its principal place of business at Chicago, Ill., at the time of the filing of the petition herein. It is the duly appointed executor of the Estate of Harold S. Brooks, deceased, who died on January 4, 1963. The Federal estate tax return for his estate was filed with the district director of internal revenue at Chicago, Ill., on April 3, 1964.

Harold S. Brooks (hereinafter referred to as decedent) was employed by W. H. Miner, Inc. (hereinafter referred to as Miner), from 1923 until his retirement on December 31, 1955, at the age of 62 years. For many years prior to his retirement, decedent was sales manager for Miner.

Miner is a Delaware corporation, with its principal office at Chicago, Ill. The corporation engineers, researches, sells, and services products to the railroad industry, its principal item being a draft gear. All of the outstanding shares of stock are owned by the William H. Miner Foundation, a charitable trust created by the founder of the corporation, William H. Miner.

In 1941, Miner created the W. H. Miner Profit Sharing Trust (hereinafter sometimes referred to as the plan). The plan, originally established as a tax-exempt employees profit-sharing plan and trust under section 165(a) of the 1939 Code, was evidenced by an amended and

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

completely restated agreement dated September 2, 1947, ruled on favorably as to tax exemption by the Internal Revenue Service on September 8, 1947, and in effect at the decedent's death. Relative to the amount of benefits, the plan provided:

In case of a Participant's death, retirement at normal or optional retirement date, permanent disability or termination of employment, he shall be vested with one hundred per cent (100%) of the closing balance of his account * * *.

Concerning the payment of benefits, the plan provided:

The adjusted closing balance of a Participant's account on retirement at normal or optional retirement date, permanent disability or termination of employment shall be paid to such Participant, and the adjusted closing balance of a deceased Participant's account shall be paid to his beneficiary or beneficiaries, by the Corporate Trustee in one sum or in installments during a period not exceeding one hundred eighty (180) months thereafter, as directed by the Trustees. * * *

Explanatory material furnished by Miner to its employees in 1947 interpreted the provisions for payments to retirees as follows: "Payments may be made in one sum or in installments during a period not exceeding 180 months, as the individual trustees determine to be best suited to your needs and circumstances or those of your beneficiary or beneficiaries."

The decedent was a participant in the plan from the date of its inception to the date of his retirement and thereafter an inactive participant to the date of his death. A "participant" is defined by the plan as any employee who has qualified for participation in the trust; an "inactive participant" is a former participant who is not entitled to share in company contributions for any fiscal year and whose account has not been completely distributed.

The sum of $591,410.48 standing to the decedent's credit in the plan at date of death was paid on February 18, 1963, by the corporate trustee thereof to the Harris Trust & Savings Bank, trustee, Harold S. Brooks Family Trust, which was a living trust created by the decedent during his lifetime and designated by him as beneficiary under the plan. The amount of the decedent's account at his retirement on December 31, 1955, was $373,620.29; the increase in value between his date of retirement and date of death was due to the accumulation of income, gains, and market value appreciation. No payments were made by the decedent to his account in the plan, the plan being noncontributory with Miner making all contributions.

The corporation also maintained a pension plan, known as W. H. Miner Pension Trust, qualified under sections 401 and 501 of the In-

ternal Revenue Code of 1954, in which the decedent was a participant. His account on retirement was $57,573.34 and was paid to him soon thereafter on April 5, 1956.

By letter dated August 2, 1954, decedent tendered his resignation, effective December 31, 1954, from Miner to A. P. Withall, president of the corporation. In the letter decedent requested a lump-sum payment of his interest in the plan. Decedent did not retire in 1954, but continued to work at Miner until December 31, 1955.

Approximately a month prior to decedent's retirement in 1955, the trustees sent a form letter to him soliciting the necessary information upon which the trustees could determine a payment plan and also requesting an expression of his wishes as to the time, amount, and number of payments. The pertinent portion of this letter is as follows:

Under the terms of the Plan, distribution of your account must be made in one sum or in installments during a period not exceeding fifteen years as the Trustees determine will best serve your needs and interest. The Trustees must accordingly decide whether to pay you your account in one sum or in installments, and if in installments how many, the amount of each and when they should commence. It would be helpful if you would furnish a statement as to your annual income requirements, the amount of annual income available to you from other sources, the names and ages of members of your family and other dependents, and an expression from you as to your wishes regarding the time, amount and number of payments.

When this information is received the Trustees will give it proper consideration and inform you of their decision as to the payment plan for your account. If this information is not received from you within sixty days from the date hereof, the general policy of the Trustees will be to make distribution of your account in approximately equal semi-annual payments on April 1 and October 1 of each year over said fifteen-year period. Any plan of payment adopted may be changed by the Trustees at any time and from time to time during the permissible payment period as your needs and circumstances warrant.

On or about December 31, 1955, the date of decedent's retirement, decedent again requested payment of his share of the plan in one sum. This request was denied by the trustees because they concluded he did not need it at the time in that he had sufficient income from other sources. The trustees were also concerned that decedent, although of sound mind, suffered from arteriosclerosis and deep emotional problems, which they thought might interfere with his ability to manage additional substantial funds. After decedent's request for a lump-sum payment was denied, he never renewed his request for a lump-sum payment, nor did he request payment by installments.

The plan provides that a retired participant may elect with the consent of the trustees to have his account held as a segregated special account solely at his risk, in which event all income, gains, losses, and asset market value adjustments are to be credited or charged only to that account and thereafter he does not share in the net earnings or loss of the general trust fund. The pertinent provisions of the plan are as follows:

*Section 13. Payment of Benefits.* * * * Pending distribution, all or part of such account may be invested, held or administered for the special account of the person or persons entitled thereto, or shall continue to share in the net earnings or loss of the Trust in the same manner as a Participant's account, at the request and solely at the risk of such person or persons and with the consent of the Trustees.

\* \* \* \* \* \* \*

*Section 8. Net Earnings and Net Loss of Trust.* * * *

\* \* \* \* \* \* \*

It is agreed that the net earnings or net loss on special account investments shall not be allocated as above, but shall be credited or charged solely to the account for which held.

Shortly after his retirement, on or about January 30, 1956, the decedent elected to have his account held as a special account under section 13 of the plan pending distribution, to which the trustees gave their consent. Immediately thereafter the trustees directed the corporate trustee to create such account and transfer thereto from the general trust fund the sum of $373,620.29, being the decedent's December 31, 1955, balance in the general trust fund. Thereafter it was held and administered as a separate segregated account of the plan by the corporate trustee until the decedent's death, statements of account being rendered to both the decedent and the trustees, under the name and title "W. H. Miner Profit Sharing Trust—Harold S. Brooks Fund." No payments were made to the decedent from his account under the plan prior to his death.

Decedent, subsequent to his retirement, requested the purchase of certain securities and the sale of other securities by the "Harold S. Brooks Fund," and his requests were formally approved and granted by the trustees. It was the custom of the trustees to discuss among themselves each transaction recommended by decedent prior to granting their approval. It was not the custom of the trustees to make a purchase or sale from the "Harold S. Brooks Fund" without the knowledge of decedent.

The following is a schedule of purchases and sales made at the request of decedent and approved by the trustees for the segregated account in the plan known as the Harold S. Brooks Fund:

| Year | Total transactions | Purchases | Sales | Approximate dollar value |
|---|---|---|---|---|
| 1956 | 22 | 22 | 0 | $274,925 |
| 1957 | 2 | 2 | 0 | 27,000 |
| 1958 | 2 | 2 | 0 | 34,300 |
| 1959 | 8 | 2 | 6 | 240,600 |
| 1960 | 3 | 2 | 1 | 133,200 |
| 1961 | 6 | 5 | 1 | 105,250 |
| 1962 | 7 | 3 | 4 | 275,550 |
| 1963 | [1] 0 | 0 | 0 | 0 |
| Total | 50 | 38 | 12 | 1,090,825 |

[1] Decedent died on Jan. 4, 1963.

Although the trustees solicit an expression of wishes from the retired participant, they endeavor to make independent determinations of what plan of payment, or lack of payment, would best serve the participant and his beneficiary on the basis of all the information received. There were a number of participants in addition to the decedent whose requests for lump-sum payments were denied. Generally a mutually acceptable plan of payment is worked out by a discussion with the individual of his needs and circumstances. A stipulated schedule of payouts to retired participants during the entire history of the plan shows that payments vary with each participant. The trustees have not approved every plan of payment requested by the participant. Each retired participant's account has been considered individually, and a final decision made by the trustees after considering both the wishes and needs of the individual.

On schedule G of the Federal estate tax return filed by the executor for the Estate of Harold S. Brooks, the executor claimed that no part of the decedent's account in the plan was includable in his gross estate. In his notice of deficiency, respondent made the following determination:

It is determined that there is includible in the decedent's gross estate the sum of $279,276.85, the portion of the amount of $591,410.48 standing to his credit in the W. H. Miner Inc. Profit Sharing Trust representing 85 of 180 equal monthly installments which were payable to the decedent under the terms of the trust instrument, from the date of his retirement to the date of his death.

OPINION

Decedent, an employee of W. H. Miner, Inc. (Miner), for many years, terminated his employment by retirement on December 31, 1955. He died on January 4, 1963. At the time of his death he had

standing to his credit in a noncontributory, qualified profit-sharing trust (the plan) maintained by Miner the sum of $591,410.48. The issue for decision is whether any portion of this sum is includable in decedent's gross estate for estate tax purposes.

Petitioner relies upon Code section 2039(c)(1)[2] to exclude the full amount of decedent's interest in the plan from his gross estate. Respondent argues that decedent's interest in the plan was payable to him in monthly installments over a period of 180 months following his retirement and points out that decedent lived 85 months after he retired. Respondent argues that a sum ($279,276.85) equal to 85 monthly installments for the period prior to decedent's death is includable in his gross estate under Code section 2033[3] on the theory that this sum was constructively received by the decedent during his lifetime and, therefore, that section 2039(c)(1) does not apply.[4] See Income Tax Regs., sec. 20.2039–2(b), ex. (4). Respondent concedes that the remainder of decedent's credit in the plan ($312,133.63) equal to 95 monthly installments which had not accrued prior to decedent's death is not includable in his gross estate by virtue of section 2039(c)(1). We think the section excludes decedent's entire interest in the plan.

Section 2039(c)(1) provides an exclusion from a decedent's gross estate of the value of an annuity or other payment receivable by a beneficiary (other than the executor) under a profit-sharing plan meeting the requirements of section 401(a) at the time of the decedent's separation from employment. Here, the plan concededly met the requirements of section 401(a) at the time of decedent's retirement, and the only question is whether the decedent's beneficiary received the decedent's share of the plan under the terms of the plan, or from the decedent who constructively received the payments prior to his death.

---

[2] SEC. 2039. ANNUITIES.

(c) EXEMPTION OF ANNUITIES UNDER CERTAIN TRUSTS AND PLANS.—Notwithstanding the provisions of this section or of any provision of law, there shall be excluded from the gross estate the value of an annuity or other payment receivable by any beneficiary (other than the executor) under—

(1) an employees' trust (or under a contract purchased by an employees' trust) forming part of a pension, stock bonus, or profit-sharing plan which, at the time of the decedent's separation from employment (whether by death or otherwise), or at the time of termination of the plan if earlier, met the requirements of section 401(a) ;

[3] SEC. 2033. PROPERTY IN WHICH THE DECEDENT HAD AN INTEREST.

The value of the gross estate shall include the value of all property * * * to the extent of the interest therein of the decedent at the time of his death.

[4] Alternatively, respondent would include in decedent's gross estate the sum of $238,414.11, computed by taking one-fifteenth of the value of the fund ($591,410.48) for each of the years ended Dec. 31, 1955, through Dec. 31, 1962, prior to decedent's death on Jan. 4, 1963. This alternative contention, like respondent's principal position, turns on the question whether decedent constructively received such amount prior to his death. Its disposition is thus controlled by our conclusion that decedent did not constructively receive his share of the fund.

The doctrine of constructive receipt has been shaped largely by the courts, although it is now defined by the Income Tax Regulations. See sec. 1.451–2, Income Tax Regs. Its essence is that funds which are subject to a taxpayer's unfettered command and which he is free to enjoy at his option are constructively received by him whether he sees fit to enjoy them or not. *Corliss* v. *Bowers*, 281 U.S. 376 (1930); *Ralph E. Wilson*, 40 T.C. 543, 548 (1963). But constructive receipt does not occur where the taxpayer's control of the funds is subject to substantial limitations or restrictions not imposed by the taxpayer himself. *Avery* v. *Commissioner*, 292 U.S. 210 (1934); *Commissioner* v. *Oates*, 207 F. 2d 711 (C.A. 7, 1953), affirming 18 T.C. 570 (1952). Thus, the crucial question is whether decedent's failure, prior to his death, to receive the disputed fraction of the sum credited to his account was attributable to his own action or inaction, or whether such failure was attributable to control of the funds and the exercise of discretion by the trustees.

We think there is little doubt that the terms of the plan restricted decedent's right to demand and receive any distributions from the fund prior to his death. Paragraph 13 of the trust instrument, quoted in our findings, provided that the "adjusted closing balance of a Participant's account on retirement * * * shall be paid to such Participant * * * in one sum or in installments, during a period not exceeding one hundred eighty (180) months thereafter, as directed by the Trustees." Along with other participants in the plan, decedent was informed as early as 1947 that this provision in the trust instrument was interpreted to mean that the trustees were given power to determine the distribution arrangement best suited to the individual needs and circumstances of the participant or his beneficiaries. Thus, the trustees were vested with discretionary power to determine when and how payment of a participant's interest should be made, provided only that full payment was made within 180 months of the date of the participant's retirement. This is what the plain language of the instrument provides. This is what the decedent and other participants in the plan were told the language of the instrument meant.

Moreover, the practical construction given the trust instrument by the trustees is consistent with its language. In every case, the trustees gathered specific information on the financial condition and needs of retirees and solicited the wishes of the retirees as to the manner of distribution. All these data were considered by the trustees in deciding upon a distribution plan best suited to the needs and circumstances of the retiree or his beneficiary. In some cases the trustees distributed the retiree's credit in a lump sum shortly after retirement; in other cases they made periodic distributions; in still other cases they

had made no distribution before the retiree died. The trustees appear to have conscientiously sought to gear their decisions as to payout arrangements to the individual needs and circumstances of the retirees.

In decedent's case, shortly before his retirement, he was sent a form letter requesting information as to his wishes concerning the manner of the distribution of his credit, his annual income requirements, the amount of income available from other sources, and the names and ages of the members of his family and other dependents. Decedent requested a lump-sum distribution of his credit in the plan. However, he had annual net spendable income of about $10,000 after taxes; he had no dependents, and he was known to live frugally. The trustees of a pension trust maintained by Miner distributed $57,573.34 to him on April 5, 1956, soon after he retired. In addition, the trustees of the profit-sharing trust were aware that decedent was afflicted with arteriosclerosis and suffered from deep emotional problems which were growing progressively worse and they were concerned about his ability to manage a large sum of money. Decedent had been confined to a sanatarium where one of the trustees had visited him prior to his retirement. In the light of these facts, the trustees denied decedent's request for a lump-sum distribution and decedent made no other request. The trustees made no distributions to decedent prior to his death. In the circumstances, we find no substantial basis for an inference that the trustees' refusal to make the requested lump-sum payment, decedent's failure to request some other distribution plan, or the trustees' failure to distribute any funds to the decedent from his account in the plan prior to his death was collusive.

Nor do we find any basis for an inference of collusion in the fact that in 1966 the trust was amended to provide for payment of a participant's share in the plan either in one sum, in substantially equal installments by purchase of an annuity contract, or by any combination of these methods. This amendment was adopted in response to the publication of Rev. Rul. 66–11, 1966–1 C.B. 71, which concluded that a qualified plan must provide for commencement of distributions of an employee's interest no later than actual retirement after the attainment of a stated age. The respondent here concedes that the plan met the requirements of section 401(a) at the time of decedent's separation from service despite the wide discretion given the trustees as to the manner and timing of distributions.

That decedent was permitted to have his account in the plan segregated and to recommend investments at his own risk does not show that the trustees had abdicated their discretionary power and that, as a result, decedent had constructively received the funds or securities credited to his account. The segregation was permitted in accordance

with one of the standard provisions of the plan. Respondent makes much of the fact that the trustees uniformly approved decedent's recommended purchases and sales but we think little probative value can be derived from this fact. Respondent cites none of decedent's recommendations that were subject to serious question. Decedent recommended transactions in only high-grade corporate securities and Government obligations. The record shows that the trustees discussed among themselves and formally approved each of the recommended transactions. Clearly, decedent's right to make recommendations on investments, even at his own risk, did not constitute constructive receipt of the fund. At no time was the fund subject to his unfettered command. At all times it was subject to control by the trustees.

Respondent relies heavily upon *Northern Trust Co.* v. *United States*, 389 F. 2d 731 (C.A. 7, 1968), rehearing denied, but it does not aid respondent's cause. In that case, a noncontributory, qualified profit-sharing plan provided for participants to select lump-sum cash payments or single annuity contracts, or a combination of the two. The manner of distribution was subject to determination by the trustees, one of whom was the decedent. The decedent elected and received 10 so-called retirement annuity policies on which 10 years of periodic payment would begin when and if he reached 95 years of age. The policies were separately subject to surrender for cash at any time. Arguing that the so-called retirement annuity policies were not true "annuities" within the exclusion provisions of section 2039(c) but were merely "sophisticated savings accounts," the Commissioner included the cash surrender value thereof in decedent's gross estate. On the record before it, the Court of Appeals, sustaining the inclusion, concluded that the decedent in fact had an option to select the manner in which his interest in the plan would be distributed and that decedent had unfettered control of his share of the plan assets. In contrast, in the instant case the decedent at retirement could only request a particular distribution plan and the trustees in fact decided when and how a participant's share would be distributed. At no time did the decedent here either actually or constructively receive his share of the plan; on the contrary, his share was at all times subject to the exclusive control of the trustees.

Respondent argues in the alternative that a portion of the assets of the Harold S. Brooks Fund is includable in decedent's estate under section 2039, subsections (a) and (b). These subsections do not apply, however, to payments excluded by section 2039, subsection (c). Nor does the fact that decedent received a lump-sum payment of his interest in the qualified pension fund change the result. As respondent's own regulations specifically state, the rights and benefits accruing

under qualified plans are excluded in determining the effect of section 2039, subsections (a) and (b), where an employee is entitled to benefits under more than one plan. Sec. 20.2039–(1)(b), ex. (6), Estate Tax Regs.; see *Gray* v. *United States*, 278 F. Supp. 281, 284 fn. 1 (D.N.J. 1967).[5]

Effect will be given in the Rule 50 computation to petitioner's claim for further deduction with respect to attorneys' fees and expenses incurred in connection with this litigation.

*Decision will be entered under Rule 50.*

---

[5] In view of our holding that petitioner did not constructively receive any part of his interest in the Harold S. Brooks Fund prior to his death, we need not consider petitioner's alternative contention that 2039(c) provides a complete exclusion of a decedent's interest in a qualified plan even if he constructively receives part or all of that interest prior to his death. See *Estate of Raymond W. Albright,* 42 T.C. 643 (1964), revd. 356 F. 2d 319 (C.A. 2, 1966).