ESTATE OF MAX SILVERMAN, DECEASED, BLANCHE S. SILVERMAN, EXECUTRIX, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2364–71.   Filed February 4, 1974.

*Irving B. Stewart*, for the petitioner.
*Ronald A. Wagenheim*, for the respondent.

OPINION

SCOTT, *Judge:* Respondent determined a deficiency in estate tax of petitioner in the amount of $4,193.85.

The issue for decision is whether the proceeds of two contracts, providing that upon their maturity date they were exchangeable for contracts providing for an annuity or annuities as selected by the owner from certain annuity options which had been purchased by a qualified pension trust established by the employer of Max Silverman (the decedent) for the benefit of decedent or the beneficiaries designated by

him, but unconditionally assigned to decedent upon the termination of his employment prior to his attaining the specified retirement age without being exchanged for a selected annuity contract, are includable in decedent's gross estate or should be excluded under the provisions of section 2039(c), I.R.C. 1954.[1]

All of the facts have been stipulated and are found accordingly.

Blanche S. Silverman, the executrix of the Estate of Max Silverman, deceased, resided in New York, N.Y., at the time the petition in this case was filed. She filed on behalf of the estate a Federal estate tax return with the district director of internal revenue for lower Manhattan.

Max Silverman, hereinafter referred to as the decedent, was born on August 11, 1896, and died at the age of 70, a resident of the State of New York, on October 21, 1966.

Letters testamentary were granted on November 9, 1966, by the Surrogate's Court, New York County, State of New York, to Blanche S. Silverman as executrix of decedent's estate.

Decedent was employed on July 30, 1942, and had been employed prior thereto by I. Schneierson & Sons, Inc., hereinafter referred to as Schneierson. Decedent continued in the employ of Schneierson until August of 1957 when he terminated his employment at the age of 61.

Schneierson entered into an agreement dated July 30, 1942, with certain of its employees and the Public National Bank & Trust Co. of New York as trustee (now Bankers Trust Co.) creating and establishing a pension trust, effective as of July 30, 1942. The original agreement dated July 30, 1942, was amended a number of times prior to December 5, 1944, on which date the pension trust agreement including all amendments was rewritten into a single instrument dated December 5, 1944. After December 5, 1944, the pension trust agreement was amended on several occasions prior to the date of decedent's termination of his employment with Schneierson but none of these amendments is relevant to the issues herein.

By letter dated December 26, 1944, the Commissioner of Internal Revenue approved the pension trust agreement as a qualified pension trust under the provisions of section 165, I.R.C. 1939 (section 165(a) of the 1939 Code was the predecessor provision to section 401(a) of the Internal Revenue Code of 1954).

Decedent as an employee of Schneierson was entitled to and did in fact become a participant in the pension trust agreement. The pension trust agreement was a noncontributing plan and decedent made no contributions to the plan.

---

[1] All references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

Article 4 of the pension trust agreement provided for a pension trust committee of five members who were required to be employees òf Schneierson. Decedent was not a member of this committee at any time nor was decedent a stockholder of Schneierson.

Article 5, section 8, of the pension trust agreement provided that as soon as practicable, but not later than 3 months after application by an eligible employee to become a participant in the pension trust plan, the Pension Trust Committee shall apply to a life insurance company or companies selected by it for contract or contracts for the benefit of such employee, which contracts shall provide for the benefits set forth in the pension plan. The application for contract and the contracts shall nominate and designate the trustee of the pension trust plan as the sole owner of the contracts, except that these contracts shall provide that the income payable after the retirement date shall be payable to the employee participant and shall provide for beneficiaries other than the trustee to receive settlement of any amount due in case of the employee participant's death.

Pursuant to the provisions of this section of the pension trust agreement, the Pension Trust Committee made application after decedent became eligible as a participant under the pension trust agreement for retirement annuity contracts for the benefit of decedent and thereafter five such annuity contracts were issued for the benefit of decedent.

Article 8 of the pension trust agreement provided that the normal retirement date in respect of any participant shall be the anniversary date of the contract obtained for his benefit nearest to his 65th birthday. Article 8 further provided that if the participant remained employed by the company after his normal retirement age, he would nevertheless begin receiving his annuity at the anniversary date of the policy as if he had retired. The pension trust agreement provided as follows with respect to the handling of these contracts upon a participant's reaching retirement age:

3. Upon attainment of retirement age, the Participant shall become entitled to the Contract or Contracts taken out for him and upon written notice to it from the Committee the Trustee shall either mail or otherwise deliver such Contract or Contracts (either without endorsements or endorsed in such manner as the Committee will approve) to such Participant, whereupon such Participant shall cease to be a party hereto.

4. The Committee after consulting with the Participant shall choose the options available under any Contract or Contracts under which payments are to be made for the benefit of such Participant during his lifetime after such retirement. Such choice of options shall be made by the Committee at least thirty days before the normal retirement date of such Participant or at such later date as the Committee shall deem advisable. Upon receipt of instructions from the Committee with respect to the choice of options made by the Committee, the Trustee shall elect the option or options chosen by the Committee. The options which the Committee may choose shall be those available in the respective Contracts issued by

the Issuing Companies from which such contracts are purchased and those thay [sic] be available by Agreement with any such issuing Company for the respective Contracts except that any such options must provide for income commencing on the retirement date which will last at least for the remaining lifetime of the Participant thereafter.

Article 10 of the pension trust agreement provides as follows with respect to termination of services by an employee participant:

1. In the event that the employment of any Participant by the Corporation or the Subsidiary shall terminate during his lifetime or prior to his normal retirement date and regardless of the cause of such termination, and whether it is voluntary or involuntary, the Committee shall immediately give a written notice to the Trustee of such termination and the date thereof. In such event the contributions of the Corporation and the Subsidiary to the cost of the benefits provided for such Participant shall cease.

2. Thereupon, the Committee, in its discretion, after conferring with the Participant, if it deems such conference feasible or advisable, shall subject to the provisions of ARTICLE XV, subdivision 12 hereof select any one of the following courses:

(a) Direct the Trustee to transfer and assign and deliver by mail or otherwise to said Participant any Contract or Contracts held by the Trustee for such Participant.

(b) Direct the Trustee to surrender any Contract or Contracts held by the Trustee to such Participant to the Issuing Company or Companies with instructions to obtain from such Issuing Company or Companies the cash value thereof or any other sum or sums remaining with such Issuing Company or Companies in connection with said Contract or Contracts and to pay over the same to such Participant.

(c) Such selection shall be made by the Committee within thirty days after the termination of the Participant's employment or at such earlier or later date as the Committee may determine. The selection made by the Committee shall be communicated to Participant by the Committee to the Trustee, and the Trustee upon receipt thereof, shall adopt such selection and comply therewith.

3. If the employment of any Participant is terminated and Participant is re-employed by the Corporation or the Subsidiary, he shall be deemed under all provisions of this Agreement to be a new Employee of the Corporation or the Subsidiary as of the date of such re-employment, provifed [sic], however, that there shall be deducted from any Contract taken out for him at the time of his re-employment the amount of the benefits received by him under this Plan at the time of the termination of his earlier employment by the Corporation or the Subsidiary.

Upon the termination of decedent's employment by Schneierson, the Pension Trust Committee instructed the trustee to deliver five annuity contracts to decedent. On November 19, 1957, the trustee assigned each of the five contracts to decedent. The contracts assigned to decedent were issued by the Equitable Life Insurance Co. of Iowa (hereinafter referred to as Equitable). Decedent prior to his death surrendered three of these contracts to Equitable and received the cash surrender value of each contract so surrendered. The remaining two contracts issued by Equitable for the benefit of decedent were policy No. A 44389 issued on July 30, 1942, and policy No. A 68865 issued on July 29,

1950. Each of these contracts provided for its maturity on July 30, 1961. Each contract provided that if decedent were living on the July 30, 1961, maturity date and the policy was in full force and effect, he would be paid a monthly lifetime annuity with a 120 months certain unless one of the options for a life annuity with a longer period certain or a joint and survivor annuity were selected. The option also provided for beginning the annuity at an earlier or later date but in no event later than the anniversary date of the contract nearest the annuitant's 70th birthday.

Contract No. A 44389 contained the following provision with respect to the method of commencement of the annuity:

16. Annuity Options

Upon the anniversary of this policy nearest to the birthday upon which the Annuitant will attain the age elected for commencement of annuity payments, herein called the maturity date, this contract will mature and, subject to the rights of any assignee, the Company will issue a Supplementary contract in exchange for this policy providing for the payment of the annuity. The cash surrender value of the policy at maturity, as shown in Table A hereof, shall be used as a single premium to provide an annuity in accordance with either Table B or Table C hereof at the option of the Annuitant. The first payment of the annuity will be made at the maturity date and subsequent payments will be made monthly thereafter until the death of the Annuitant.

If a Life Annuity is elected in accordance with Table B, said annuity payments will terminate with the last monthly payment made preceding the death of the Annuitant. If a Refund Annuity is elected in accordance with Table C and the death of the Annuitant occurs before the total of annuity payments made by the Company is equal to the cash surrender value of the policy at the maturity date, the Company will continue the annuity payments to the beneficiary until the total annuity payments made shall equal the said cash surrender value, except that upon the death of the last surviving beneficiary any such payments remaining will be commuted at the rate of three per cent per annum compound interest and paid in one sum to the executors or administrators of the said last surviving beneficiary. If the annuity payments payable to any beneficiary are less than ten dollars each, the Company reserves the right to commute any payments thereafter becoming due at the rate of three per cent per annum compound interest and make settlement thereof in one sum with the beneficiary entitled to receive said annuity payments.

If there be no beneficiary living at the death of the Annuitant then any further payments due under this contract will be commuted at the rate of three per cent per annum compound interest and paid in one sum to the executors or administrators of the Annuitant.

Contract No. A 68865 contained a substantially similar provision.

No premiums were paid on these contracts after July 31, 1956. Because of nonpayment of the annual premium due July 30, 1957, both contracts were left in force as of that date on the reduced paid-up annuity basis with the cash surrender value at the date of lapse accumulating with interest.

Each of these policies contained nonforfeiture provisions. The provision contained in policy No. A 44389 was as follows:

13. Nonforfeiture Provisions

(a) Automatic Paid-up Annuity

If after the payment of premiums for one full year or more, default is made in the payment of a subsequent premium, this policy shall upon such default without action on the part of the Annuitant, be continued as a fully paid-up participating annuity payable at the same time and under the same conditions as this policy. The amount of such annuity shall be such proportionate part of the income shown in Tables B and C as the cash surrender value of the paid-up annuity at the maturity date (as defined in paragraph 16 hereof) bears to the cash surrender value shown in Table A at the maturity date. Such paid-up annuity may be surrendered for its cash surrender value at any time which shall be the cash surrender value at time of default in premium payment accumulated at compound interest at such rate as the Company may determine but never less than three per cent per annum to the date of surrender. In the event of the death of the Annuitant after default in premium payment and before any annuity payment is made said cash surrender value will be paid to the beneficiary upon receipt of due proof of such death and the surrender of this policy.

(b) Cash Surrender

After the end of the first policy year and after the payment of premium for one full year and before default in the payment of premium or within three months after such default, the Annuitant may, upon written request, with the consent of any assignee and of any beneficiary whose interest is irrevocable, elect to terminate this policy and receive the cash surrender value hereof as stated in Table A for the number of years that the policy has been carried in force.

Policy No. A 68865 contained a comparable provision except that it specifically stated that within 60 days after the default of any premium, the option might be elected to continue the policy as a participating paid-up annuity payable at the same time and under the same conditions as provided in the policy or to terminate the policy and receive the cash surrender value plus any outstanding dividend or accumulated dividends less indebtedness on the policy, but specifying that if no election were made, the policy would be continued as a participating paid-up annuity.

Decedent left both contracts with Equitable, and as a result thereof interest was accumulated on the cash surrender value at the time premiums ceased to be paid for decedent's life. Decedent named his wife, Blanche S. Silverman, as the beneficiary under each of these Equitable contracts. During his life decedent made a loan on policy No. A 68865, and $2,407.22 of the loan remained unpaid at his death. On March 2, 1964, decedent deposited policy No. A 44389 as collateral for a loan of $10,000 which he made from the Manufacturers Hanover Trust Co. Although decedent's death occurred over 5 years after the maturity date stated in the policies and over 2½ months after the anniversary date nearest his 70th birthday, decedent had not surrendered the policies for supplemental policies specifying the annuity

elected and at his death was receiving no annuity under either of these contracts.

Schneierson's plan, contained in the pension trust agreement in effect at the date of termination of decedent's employment, was terminated with approval of the Commissioner of Internal Revenue on February 10, 1958.

The assignment to decedent on November 19, 1957, of each of the contracts obtained for his benefit recited that for a valuable consideration the trustee "hereby sells, assigns, transfers and sets over * * * its right, title, and interest in and to said policy, subject to all the terms and conditions in said policy." The assignment further provided that it was made pursuant to the provisions of the pension trust established by Schneierson.

After decedent's death, the proceeds of policy No. A 44389 which totaled $45,849.26 and the proceeds of policy No. A 68865 which totaled $54,725.12, after giving effect to a loan made by decedent during his lifetime of $2,407.22, were paid to Blanche S. Silverman, the widow of decedent, in accordance with the designation of her as beneficiary of the policies.

On the estate tax return no amount was included because of the receipt by Blanche S. Silverman of the proceeds of the two Equitable policies.

Under item 5 of Schedule F of the estate tax return, the following appeared:

Equitable Life Insurance Co. of Iowa—two policies issued in name of decedent (policies #A68865 and A44389) payable on death to Blanche S. Silverman. Policies were issued in connection with a qualified non-contributory employees Trust. Policies were distributed to decedent as an employee on his separation from service. The entire proceeds of $100,574.38 are excludable under Section 2039 (c) of the Internal Revenue Code.

Respondent in his notice of deficiency increased the taxable estate as reported by the $100,574.38 with the explanation that "It is determined that the proceeds of two insurance policies in the amount of $100,574.38 are includable in the decedent's gross estate and that such amount is not excludable within the purview of Section 2039(c) of the Internal Revenue Code of 1954 as claimed on the estate tax return."

Initially, we point out that it is absolutely clear from the facts in this case that the proceeds of the two annuity contracts are includable in decedent's gross estate under the provisions of section 2033 unless excluded therefrom by some other provision of the Code. That section provides that the value of the gross estate shall include the value of all property to the extent of the interest of the decedent therein at the date of his death. In this case decedent at the date of his death was the absolute owner of the annuity contracts.

Petitioner does not deny that except for the provisions of section 2039(c), the value of the annuity contracts would be includable in decedent's gross estate under section 2033. Petitioner states that a literal reading of section 2039(c)[2] permits of no conclusion except that the proceeds of the two Equitable contracts are excludable from decedent's gross estate.

Petitioner states that it is clear that the payments of the proceeds of these contracts were payments received by Blanche S. Silverman under a contract purchased by an employee trust which formed part of a pension plan which at the time of decedent's separation from employment met the requirements of section 401(a). Petitioner states that since facts to support this contention are stipulated, the entire proceeds of the contracts are excludable under section 2039(c).

Respondent's contention is that Blanche S. Silverman did not receive the proceeds under contracts purchased by Schneierson's pension trust but under contracts in effect purchased by decedent. Respondent contends that when the contracts were assigned to decedent in lieu of a

---

[2] SEC. 2039. ANNUITIES.

(c) EXEMPTION OF ANNUITIES UNDER CERTAIN TRUSTS AND PLANS.—Notwithstanding the provisions of this section or of any provision of law, there shall be excluded from the gross estate the value of an annuity or other payment receivable by any beneficiary (other than the executor) under—

(1) an employees' trust (or under a contract purchased by an employees' trust) forming a part of a pension, stock bonus, or profit-sharing plan which, at the time of the decedent's separation from employment (whether by death or otherwise), or at the time of termination of the plan if earlier, met the requirements of section 401(a) ;

(2) a retirement annuity contract purchased by an employer (and not by an employees' trust) pursuant to a plan which, at the time of decedent's separation from employment (by death or otherwise), or at the time of termination of the plan if earlier, was a plan described in section 403(a) ;

(3) a retirement annuity contract purchased for an employee by an employer which is an organization referred to in section 503(b) (1), (2), or (3), and which is exempt from tax under section 501(a) ; or

(4) chapter 73 of title 10 of the United States Code.

If such amounts payable after the death of the decedent under a plan described in paragraph (1) or (2), under a contract described in paragraph (3), or under chapter 73 of title 10 of the United States Code are attributable to any extent to payments or contributions made by the decedent, no exclusion shall be allowed for that part of the value of such amounts in the proportion that the total payments or contributions made by the decedent bears to the total payments or contributions made. For purposes of this subsection, contributions or payments made by the decedent's employer or former employer under a trust or plan described in paragraph (1) or (2) shall not be considered to be contributed by the decedent, and contributions or payments made by the decedent's employer or former employer toward the purchase of an annuity contract described in paragraph (3) shall, to the extent excludable from gross income under section 403(b), not be considered to be contributed by the decedent. This subsection shall apply to all decedents dying after December 31, 1953. For purposes of this subsection, contributions or payments on behalf of the decedent while he was an employee within the meaning of section 401(c)(1) made under a trust or plan described in paragraph (1) or (2) shall be considered to be contributions or payments made by the decedent. For purposes of this subsection, amounts payable under chapter 73 of title 10 of the United States Code are attributable to payments or contributions made by the decedent only to the extent of amounts deposited by him pursuant to section 1438 of such title 10.

cash payment upon the termination of decedent's employment, decedent himself constructively received payment under the employees' pension plan and procured the annuity contracts. Respondent argues that therefore the beneficiary received the payments under contracts in effect acquired by decedent.

Respondent relies primarily on the case of *Northern Trust Co.* v. *United States*, 389 F. 2d 731 (C.A. 7, 1968). In that case the court held that certain annuity contracts did not fall within the provisions of section 2039(c) since the decedent in that case had constructively received his share of the proceeds under the plan prior to his death. The facts in that case showed that in 1951 decedent's employer, a corporation, in anticipation of dissolution, purchased annuity contracts with funds forming part of a qualified employees' pension trust which had been in effect since 1942 and then assigned these annuity contracts to the decedent, an employee participant. The facts showed that decedent was one of three trustees of the plan and at the direction of a trustee other than decedent the corporate trustee assigned to the decedent, who was then 77 years of age, the contract procured for him. The facts further showed that even though the decedent in that case had rights to obtain annuities or to obtain the cash surrender value of the contracts, he never exercised any of these rights and the entire cash surrender value at the date of his death was received by the beneficiaries he designated. The United States Court of Appeals for the Seventh Circuit there stated (p. 735) :

We agree with the District Court that the decedent in fact had an option to select the manner in which his interest in the plans would be distributed. The exclusion of § 2039(c) is not applicable. The cash surrender value of the annuity contracts were properly includable in decedent's gross estate as property owned by him at the date of his death. The decedent had unfettered control of his share of the plan assets. * * *

Petitioner points to certain factual distinctions in the *Northern Trust Co.* case and the instant case and argues that the facts in the instant case more nearly resemble the facts in *Estate of Harold S. Brooks*, 50 T.C. 585 (1968), and *First Trust Co. of Saint Paul* v. *United States*, 321 F. Supp. 1025 (D. Minn. 1970).

In our view, as respondent contends, the facts in the cases of *Estate of Harold S. Brooks*, *supra*, and *First Trust Co. of Saint Paul* v. *United States*, *supra*, are distinguishable from the facts in the instant case, and these distinctions are such that those cases in no way support petitioner's position in the instant case. We further agree with respondent that here, as in the *Northern Trust Co.* case, there is no showing and no basis for assuming that the Pension Trust Committee would not honor the decedent's election as to whether he received cash or annuity contracts. There is no evidence in this case to indicate

whether the committee, in fact, consulted with decedent and, if it did, what options decedent requested. However, in the absence of evidence, we must assume that the Pension Trust Committee honored whatever request decedent made as to the methods of distribution to him of his interest in the pension trust when he terminated his employment with Schneierson. We, therefore, agree with respondent that there is no substantive distinction in the *Northern Trust Co.* case and the instant case.

However, the facts in this case are such that we need not decide whether, when decedent was assigned his complete interest in the pension trust by being assigned absolute right in the contracts which the trustee had procured for his benefit, he had any form of constructive receipt of his interest in the plan. When a person is granted an option to take cash or property of a value equal to that cash as was the situation here at the time the policies were assigned to decedent, the actual receipt by that person of the property is clear. However, there remains a question whether under such circumstances the person may be said to have constructively received the cash he might have elected to take but did not and used it to purchase the property. In our view under the facts present in this case, the proceeds of the two annuity contracts received by decedent's widow are not excludable from decedent's gross estate under section 2039(c) for reasons other than those which might involve questions of constructive receipt. Therefore, we will not further consider the applicability of the doctrine of constructive receipt as set forth in the case of *Northern Trust Co.* v. *United States, supra,* to the facts in this case.

Section 2039(c) provides for the exclusion from the gross estate of "the value of an annuity or other payment" receivable by any beneficiary other than the executor "under—(1) an employees' trust (or under a contract purchased by an employees' trust) forming a part of a pension * * * plan" which at the time of decedent's separation from employment or the time of termination of the plan, if earlier, meets the requirements of section 401(a). Decedent's beneficiary here did not receive an annuity as that term is ordinarily used but the question still remains whether she received an "other payment * * * under an employees' trust (or under a contract purchased by an employees' trust) forming a part of a pension * * * plan." It is clear that decedent's beneficiary received nothing under an employees' trust other than via the contracts, since long prior to his death decedent had been given absolute and unconditional ownership of all his interest in the employees' trust. Our question, therefore, comes to whether decedent's beneficiary received a payment "under a contract purchased by an employees' trust" within the meaning of section 2039(c)(1).

In our view she did not. The contract which had been purchased by the employees' trust which formed a part of a pension plan was a contract for an annuity which would be paid to decedent commencing on his 65th birthday whether or not he had actually retired from employment by Schneierson. The contract further provided for options which might have been selected by the owner of the contract for annuities to begin on the anniversary date of the policy nearest to the 70th birthday of the annuitant. However, the pension trust plan of Schneierson was absolutely clear that the Pension Trust Committee was required to have the annuity under the plan start when the annuitant reached age 65, even though the annuitant might still be employed by Schneierson. The owner of the policy under the plan was the trustee, but the trustee was required upon instructions from the committee to elect the option chosen by the committee, which option was required by the plan to be an annuity for life beginning at age 65. In our view the statute as written carrying the parenthetical statement "(or under a contract purchased by an employees' trust)" immediately preceding the words "forming a part of a pension * * * plan," logically interpreted, means a contract which would meet the requirements for an annuity payment in conformity with the provisions of the pension plan. Once the contract here involved was assigned to decedent absolutely, the restrictions contained in the pension plan that payment of an annuity to decedent would in all events commence at age 65 (thus eliminating any right of the owner of the contract to the cash surrender value) were effectively eliminated, thereby causing the contract as assigned not to be one conforming to the requirements of the pension plan. It would follow that the contract then ceased to be any part of a pension plan. The plan permitted the Pension Trust Committee initially to apply only for contracts for the benefit of the participant which *shall provide for the benefits set forth in the plan.*

In our view, in order for a payment to be exempt from estate tax under the provisions of section 2039 (c), it must be a payment made under a plan which meets the requirements of section 401 (a). The only portion of section 2039 (c) which could cause the payments here involved to be excluded from estate tax is the provision of section 2039 (c) (1). The portion of section 2039 (c) following subparagraphs (1), (2), (3), and (4) thereof states:

If such amounts payable after the death of the decedent under a plan described in paragraph (1) * * *, are attributable to any extent to payments or contributions made by the decedent, no exclusion shall be allowed for that part of the value of such amounts in the proportion that the total payments or contributions made by the decedent bears to the total payments or contributions made. * * *

In our view, this provision, though dealing with a problem not here involved of contributions by both employer and employee, is a clear in-

dication that the exclusion applies only to payments made under the plan which is exempt under section 401(a). In this case the payments were not made under the plan since the contracts, after they were assigned absolutely to the decedent, were never surrendered as by their terms they should have been for annuity contracts so that decedent could obtain an annuity in accordance with the plan.

While the legislative history of section 2039(c), as originally enacted, is not helpful in determining the intent of the parenthetical provision "(or under a contract purchased by an employees' trust)," the report of the Senate Finance Committee with respect to the addition of subparagraph (3) to section 2039(c) by the Technical Amendments Act of 1958 contains an inference that the section applies only to payments received under a qualified plan. The report of the Senate Finance Committee, in explaining this amendment, states as follows:

*Estate-tax exclusion*

Subsection (e) of section 24 of the bill is a committee amendment to section 2039(c) of the 1954 Code, relating to the exclusion of certain annuities from the gross estate. Section 2039(c) presently provides an exclusion from the gross estate for the value of an annuity or other payments receivable by a beneficiary (other than the executor) under certain plans qualified under section 401(a). * * *

S. Rept. No. 1983, 85th Cong., 2d Sess. (1958), 1958–3 C.B. 1074. In our view this statement of the Senate Finance Committee is in effect an interpretation of the provisions of section 2039(c) to mean that only payments received under a qualified plan are to be excluded. In our view if a contract containing no restrictions that would cause it to comply generally with the restrictions contained in the pension plan is assigned to a participant in a plan, the exclusion was not intended to apply if the rights of the participant in the contract were so absolute that the contract was clearly includable in his gross estate under section 2033 as is the situation here. The interpretation which we have given to section 2039(c) is in accord with the interpretation given to that section by the United States Court of Appeals for the Second Circuit to which an appeal in this case would lie in *Commissioner* v. *Estate of Albright*, 356 F. 2d 319(C.A. 2, 1966), reversing 42 T.C. 643 (1964). The portion of section 2039(c) involved in the *Albright* case was the provision that "no exclusion shall be allowed for that portion of the value of such amount [amounts payable after death of the decedent under plans described in section 2039(c)(1), (2), (3), and (4)] in proportion that the total payment or contribution made by the decedent bears to the total payments or contributions made." In our decision in *Estate of Raymond W. Albright*, 42 T.C. 643, 652 (1964), we stated:

With respect to the general annuity provisions, section 2039(a) and (b), it is clear they are not exclusive. The question is whether the exclusion provided for under section 2039(c) with respect to certain qualified plans or trusts is a com-

plete exclusion from tax or merely an exclusion of amounts that might only fall within subsection (a) of section 2039.

The statutory language, reading as follows: "Notwithstanding the provisions of this section or any provision of law, there shall be excluded from the gross estate the value of an annuity or other payment receivable by any beneficiary (other than the executor)"—is quite clear in its meaning. Congress, in adopting this language, specifically extended exclusion coverage to amounts that might be includable under provisions of law other than 2039(a), thereby stating, in effect, that 2039(c) is not to be construed narrowly so as to limit its application to items that fall exclusively within the provisions of section 2039(a).

In this setting we cannot construe the plain statutory words "Notwithstanding the provisions of this section or any provision of law," in such a way as to subvert their meaning.

In view of the foregoing discussion, we believe the correct rule to be that the value of annuities or other payments receivable by a beneficiary under a qualified trust or plan which falls within subsection (c) of section 2039 is to be excludable from a decedent employee's gross estate notwithstanding any other gross estate provision to the contrary.

[Fn. omitted.]

In light of the view we took of section 2039(c), we held that amounts which had been received by the beneficiary of the decedent in the *Albright* case which consisted of his contribution to payments on annuity contracts purchased for his benefit by a qualified pension plan, on which contracts payments had also been contributed by the employer, were includable in that decedent's estate only to the extent of the percentage that the decedent's contributions bore to the total amount contributed by the decedent and his employer. In that case no contracts had been assigned to decedent and he died prior to the date an annuity would become due him. Therefore his interest under the annuity contracts which had been purchased by the pension plans was terminated and the death benefit consisting solely of his contributions to the contracts was paid to his beneficiary. The Second Circuit in reversing our holding stated that in its view even if the payments received by the beneficiary in the *Albright* case were "other payments" within the meaning of section 2039(c), they were nevertheless includable in their entirety in the decedent's estate. The court explained this holding as follows (p. 323) :

We should, of course, construe Section 2039(c) in a way that is consistent with the history and the spirit of federal estate tax legislation. We believe we best comply with this requirement if we hold that when Congress enacted Section 2039 it intended to continue the preexisting rules that frequently required the inclusion in a decedent's gross estate of payments received by the decedent's beneficiary under an annuity contract if the payments were attributable to the decedent's contributions to the cost of the contract. True, the applicable legislative history does not affirmatively establish that this was the intent of Congress; but neither does it contain any indication that Congress intended to deviate from the pre-1954 rules that frequently required the inclusion of such payments, and this silence suggests to us that Congress intended no such change. This view of

Section 2039(c) means that the apportionment formula contained therein is *only* applicable in situations in which the decedent's beneficiary receives a payment that is attributable to the contributions of both employer and employee. In such a situation the purpose of apportionment would be to insure that only the proportionate part of this payment that reflects the proportion the decedent-employee's contributions bore to the contributions of both employee and employer, was included. In the present case, however, the payments received by Mrs. Albright were solely attributable to the decedent's contributions to the two contracts. Consequently, the apportionment formula set out in Section 2039(c) is inapplicable, and as the payments Mrs. Albright received would have been fully includable under pre-1954 Code law, they are fully includable here. [Fns. omitted.]

This reasoning of the Second Circuit, that section 2039(c), insofar as it provides for apportionment, is applicable only in situations where the amount received by the beneficiary is attributable to contributions by both the decedent and his employer, requires section 2039(c) to be read as being limited in its applicability to payments which would not have been includable in the decedent's gross estate except for the provisions of section 2039(a) or (b).

While the factual situation involved in the *Albright* case differs from that in the instant case, the appeals court in that case refused to interpret the words of the section in a manner which it considered to defeat the overall purpose of the provisions of section 2039 even though a literal reading of the words of the section was susceptible of such an interpretation.

Based on our interpretation of section 2039(c) and considering the rationale of the Second Circuit in *Commissioner* v. *Estate of Albright*, *supra*, we conclude that the payments received by decedent's beneficiary under the two contracts here involved are not excludable from decedent's gross estate.

Reviewed by the Court.

*Decision will be entered for the respondent.*

---

TANNENWALD, *J.*, concurring: I agree with the result reached by the majority simply because, as Judge Hall puts it, the facts herein show that the "decedent strayed materially from the plan's payment provisions" and hence section 2039(c) should not apply. I see no need in this case to engage, as both the majority and Judge Hall's opinions do, in an expansive analysis of what might be the situation in other circumstances or the applicability or nonapplicability to section 2039(c) of the principle of constructive receipt which infuses the treatment of qualified employee annuities for income tax purposes. The reach of that principle in the field of taxation is murky at best. A similar description can be ascribed to the language of the opinions in *Northern Trust*, *Albright*, and *Brooks*. In this latter connection,

it is enough, for the purposes of this case, to note that those cases are all distinguishable on their facts. While I am not rigidly averse to "biting the bullet," I see no need to do it where, as is the situation herein, the facts do not demand such a course of action and to do so may cause us to foreordain, or at least foreshadow, the results of future cases.

RAUM, J., agrees with this concurring opinion.

---

HALL, J., concurring: While I concur in the results reached by the majority, I cannot subscribe to some of the language in the opinion. In my view, the annuity proceeds are includable in decedent's gross estate solely because decedent, by his inaction when he reached normal retirement date, avoided the clear intent and requirement of his retirement plan that the annuities were then to go into pay status, and thereby effectively converted them into savings accounts to be held at interest which accumulated for his benefit. By doing so, he removed them from the statutory category of "payment receivable * * * under a contract purchased by an employees' trust * * * part of a pension * * * plan" and precluded the availability of a section 2039(c) exclusion to his estate.

The income and the estate tax benefits provided by Congress with respect to qualified employee benefit plans are both generous and unique in the Code. For income tax purposes, amounts contributed by an employer under such a plan are normally both deductible to the employer (section 404) and excludable from the employee's income (section 402). Such amounts accumulate tax free until distribution (section 501(a)), and upon ultimate distribution are accorded still further special tax advantages (section 402). Finally, payments receivable by a beneficiary under such a plan are excludable from a decedent's gross estate under section 2039(c). Proper construction of the details of this entire statutory scheme should commence with the recognition that Congress sought to facilitate the provision by employers, on a nondiscriminatory basis, of a private retirement system on which the hand of the tax collector was intended to rest lightly.[1] Such objectives ought

---

[1] The Senate Finance Committee has stated in connection with the current legislation in the Congress on Private Pension Plan Reform (Report of the Committee on Finance, United States Senate, Together with Additional and Supplemental Views on S. 1179, S. Rept. No. 93–383, 93d Cong., 1st Sess., pp. 107–108 (1973)) :

"Concern has been expressed in the case of the administration of employee benefit plans (and also tax exempt organizations) as to whether the Internal Revenue Service with its primary concern with the collection of revenues is giving sufficient consideration to the purposes for which these organizations are exempt. Many believe that the present organization of the Service causes it to subordinate concern for the protection of the interests of plan participants (or the educational, charitable, etc., purposes for which the exemptions are provided).

"On the other hand, the enormous growth in retirement plans during the last third of a

not to be frustrated by accepting respondent's invitation to read into the language of the Code new prerequisites for the tax benefits so offered which are not plainly required to carry out the statutory purpose and intent.

Within this overall framework, the purpose of section 2039(c) was apparently to prevent the erosion by estate taxes of amounts payable to beneficiaries under qualified plans, leaving such beneficiaries generally taxable on such amounts in the same manner and to the same extent as the decedent-employee would have been had he survived. Where amounts are in fact payable under the terms of a qualified retirement plan, they are entitled to this benefit.

Respondent, paying little heed to the statutory purpose, points out that in 1957 the Pension Trust Committee had the right, instead of furnishing decedent with the annuity contracts in question at the time of decedent's termination from employment, to cash in the contracts and pay cash to decedent. Respondent observes further that after decedent had received the contracts, he could have surrendered them for cash, even though he did not. Respondent contends that the existence of such unexercised rights removes the contracts in question from the protection of section 2039(c) and exposes their proceeds to the estate tax.

In my view, this contention should be firmly rejected as inconsistent not only with the statutory language but with the beneficent purpose of the tax law providing special tax benefits for qualified plans, and as effectively negating section 2039(c). Qualified retirement plans frequently and customarily include optional provisions permitting pay-

century has proceeded largely under the tax regulations of the Internal Revenue Service. Moreover, clearly the greatest single protection for rank and file employees during this time has been the Internal Revenue Service's administration of the provision denying any special tax treatment for contributions or benefits discriminating in favor of employees who are officers, shareholders, supervisors, or highly compensated employees. The thrust of this provision is to require broader substantial participation in the plans than would be provided but for the Service's administration of the statute.

"At the same time, it must be recognized that the natural tendency is for the Service to emphasize those areas that produce revenue rather than those areas primarily concerned with maintaining the integrity and carrying out the purposes of exemption provisions. Similar concern has been expressed in the past over the Service's administration of the provisions of the tax law relating to exempt organizations.

"The committee believes that in the employee benefit plan and tax exempt organization area it should be easier to emphasize the basic objectives involved if the activities relating to these plans and exempt organizations were more closely coordinated, if the activities in these areas relating to auditing, rulings, etc. whether in the field or in the national office are brought together and if the top direction for these activities also has specialized in them. For the reasons outlined, the bill establishes a separate office in the Internal Revenue Service, headed by an Assistant Commissioner for Employee Plans and Exempt Organizations to deal primarily with plans that are (or claim to be) qualified under section 401 of the code and organizations that are (or claim to be) exempt from income taxes under section 501(a) of the code. This includes pension, profit-sharing and stock bonus trusts and plans, religious, educational, charitable, organizations and foundations as well as the various other exempt organizations described in section 501(c) of the Code. * * *"

ment of benefits in the form of cash in a lump sum on separation from service. The Code not only contemplates such payments but expressly provides them with favorable tax treatment. Sec. 402(a)(2). In the absence of any clear indication in the Code or regulations that the mere provision in a plan for the possibility of such payments at the time of retirement, whether exercisable at the option of the trustee, plan administrator or the participant, was intended to preclude the applicability of section 2039(c) in cases where no such option was in fact exercised, we ought to have little patience with any such contention. By the same token, respondent's argument that section 2039(c) is inapplicable if an annuity contract distributed to a participant may be surrendered for cash exceeds the statutory language and intent. If there had in fact been such a surrender, of course the resulting cash would be includable. But where an asset is in terms excludable from the gross estate, the mere fact that it could have been (but was not) exchanged for another asset (cash) not so excludable is no warrant for overriding the clear statutory language. This point derives added force from the fact that retirement annuities not yet in pay status are, indeed, customarily so exchangable.[2]

In the light of industry practice, little would be left of section 2039(c) were respondent's contentions to be accepted. Respondent's position is particularly puzzling since he makes no such contentions of "constructive receipt" in the highly analogous income tax area. Section 1.402(a)-1(a)(2) of the Income Tax Regulations provides, in part, that if a qualified trust purchases an annuity contract for an

---

[2] The standard retirement annuity policy provides for a cash surrender value. The annuities in issue are standard contracts. The usual form of retirement annuity is as follows:

Level premiums are deposited with the insurance company during the deferral period and accumulate at interest. In the event of the death of the annuitant prior to age 65 (maturity date of the contract), the contract provides for return of the cash surrender value. During the deferral period the owner of the contract (be that the trustee or annuitant) may withdraw the cash value at any time and terminate the contract. On the other hand, if the contract lapses, the cash value is automatically applied to produce a paid-up deferred annuity in a reduced amount. However, the owner (trustee or annuitant) of the lapsed policy may surrender the paid-up annuity at any time.

Premiums for the contract are quoted on the basis that the accumulated sum at maturity will be applied under a life annuity with 120 monthly installments guaranteed. At maturity, however, the annuitant may elect at his option another form of annuity (e.g., joint and survivor), the actual monthly installments being appropriately adjusted. In addition, at maturity, the owner (trustee or annuitant) has the further option of taking the accumulated sum in cash instead of in the form of an annuity.

The usual form of retirement annuity permits the annuitant to have the income commenced at an earlier or later date than the one originally specified in the contract with an appropriate adjustment in the amount of income. Thus, the accumulated cash value is applied to the selected age as a single premium to purchase an immediate life annuity with the amount of the annuity income depending upon the amount of the cash value, the age selected, and the form of life annuity chosen.

See Huebner & Black, Life Insurance 123–124 (8th ed. 1972); MacLean, Life Insurance 61–63 (9th ed. 1962); Magee, Life Insurance 74–76 (3d ed. 1958).

employee and distributes it to the employee in a year for which the trust is exempt, the contract containing a cash surrender value which may be available to the employee by surrendering the contract, such cash surrender value will not be considered income to the employee unless and until the contract is surrendered. *Estate of George E. Russell*, 47 T.C. 8, 10–11 (1966), approved this regulation. See *Estate of Harry Snider*, 39 T.C. 341 (1962); *Estate of Harry Snider*, 31 T.C. 1064 (1959); Rev. Rul. 65–267, 1965–2 C.B. 141; Rev. Rul. 55–298, 1955–1 C.B. 394. Rev. Rul. 68–482, 1968–2 C.B. 186, notes the rationale for such a position; it holds that the cash value of a section 403(b) annuity contract is not considered made available to an employee, merely because he can receive the cash value by surrendering the contract and forfeiting his rights thereunder, because the employee suffers a significant penalty in that normally the cash value of an annuity is insufficient to purchase a new annuity contract of comparable or greater value to the employee. Income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. Sec. 1.451–2, Income Tax Regs.

Here decedent has an annuity which is not only guaranteed in advance, but was probably purchased at a lower rate than he could obtain it because of absence of commission or expense.

Nor is respondent's reliance on *Northern Trust Co.* v. *United States*, 389 F. 2d 731 (C.A. 7, 1968), well founded. In that case, the court included in a decedent's estate annuities which had been purchased at age 77 to go into pay status over 17 years later, at age 95. Clearly enough, any such extreme postponement of commencement of pay status leaves no doubt that the annuities in question were being used for the simple accumulation of an estate rather than for a bona fide pension. No pension plan providing for a normal retirement age of 95 would be likely to qualify, for the benefits thereunder would in no meaningful sense be benefits under a true "pension plan." Sec. 1.401–1(b)(1)(i), Income Tax Regs.; Rev. Rul. 72–241, 1972–1 C.B. 108; Rev. Rul. 72–240, 1972–1 C.B. 108. The assets in question were therefore not receivable under "an employees' trust (or under a contract purchased by an employees' trust) forming part of a *pension* * * * plan* which * * * met the requirements of section 401(a) [emphasis added]." Had the *Northern Trust* plan called for a routine postponement of pay status to age 95, it would not apparently have qualified. And assuming the terms of the plan called for a more normal retirement age and an earlier pay status, if the decedent took it on himself with the individual trustees' cooperation to achieve such a postponement, the amount would have ceased to be received "under" a trust forming part of the qualified pension plan. It would instead have been received under the decedent's own arrangement, essentially an arrangement for a death-time transfer of wealth in lieu of a pension.

Section 2039(c) therefore would not apply. While agreeing entirely with the result in *Northern Trust*, I must respectfully disagree with so much of its reasoning as finds the mere availability of a right of cash surrender at the option of a nonadverse committee disqualifying under section 2039(c). Cf. sec. 72(h).

The reason I agree with the majority conclusion is that on the facts of the present case decedent did not follow the qualified plan, which called for pay status to commence at age 65. Once decedent strayed materially from the plan's payment provisions, he converted the payment from one "under" a qualified employee trust into one under his own personal plan, which.he implicitly arranged with the insurance company to substitute for the qualified plan. Having taken himself out from the scope of section 2039(c), he could no longer rely on its protective power.

The pension trust agreement in this case provided that whether or not a participant remained in the company's employ after age 65, the annuity policy held for the participant's benefit would go into pay status on the anniversary date of the contract nearest to the participant's 65th birthday. Decedent was a participant in this plan. Decedent terminated his employment in 1957 when he was 61 years old, at which time the Pension Trust Committee ordered the trustee to deliver to decedent the two annuity contracts which are now under consideration, both of which matured shortly before decedent's 65th birthday. The contracts provided that if decedent were living on the maturity date (June 30, 1961, the anniversary date closest to his 65th birthday) a life annuity with 120 months certain would commence, unless he elected to receive a refund annuity or a joint and survivor annuity. Such commencement, however, was apparently not in practice automatic, but required some affirmative request by decedent, since decedent reached the maturity date and payments did not then commence. The contracts also provided that decedent had the option to begin the annuity earlier or later than age 65, but not later than the anniversary date of the contract nearest his 70th birthday. Decedent died about 2½ months after the anniversary date nearest his 70th birthday, having selected no annuity plan and without receiving any annuity payments under either of the two contracts. The issuing insurance company apparently acquiesced in decedent's inaction, treating it in effect as a request to leave the cash surrender value at interest well beyond the time (age 65) when the qualified plan contemplated that the annuity would go into pay status.

In my view, the contracts in issue ceased to answer the description of section 2039(c) when decedent, at maturity date (normal retirement age as defined in a pension plan), failed to request the insurance com-

pany to commence payment.[3] Prior to that time decedent held contracts purchased by an employees' trust forming part of a qualified pension plan. When the contracts were not activated at normal retirement, decedent's inaction effectively caused an exchange of the qualifying retirement annuity for something other than the retirement annuity, as contemplated by the pension plan, and at that time it ceased to be excludable from his gross estate. What decedent thereafter held was in effect a mere savings arrangement, under which the cash surrender value of his retirement contracts was held for him at interest, an arrangement quite foreign to the wording and intent of the qualified plan. In fact, had the plan contained a provision authorizing the mere indefinite retention and accumulation at interest until death of the amount standing in decedent's account at the time of termination, the plan probably would not have continued to qualify. See Rev. Rul. 56-656, 1956-2 C.B. 280; cf. sec. 20.2039-2(b), example 4, Estate Tax Regs. To hold otherwise would permit the conversion, by mere inaction, of a bona fide retirement annuity, subject to income tax under the rules of section 72, into a tax-free savings account, the interest on which would accumulate tax free until death, and which then would also escape estate tax under section 2039(c). In order to confine the generous provisions of the Code to the true pension to which they were intended to apply (without imposing extra-statutory, judge-made restrictions thereon which would be a trap for the unwary but bona fide pensioner) I would construe section 2039(c) to be unavailable to annuities the commencement of pay status of which had been prolonged beyond the contemplation of the plan, by express or implied special arrangement with the annuity carrier after receipt of the annuity contract.

---

[3] The contract contemplates that prior to maturity the annuitant will select the option he prefers (i.e., life annuity with 120 months certain, a refund annuity, or joint and survivor annuity) and instruct the insurance company to commence payment.